### STATE of Tennessee, DEPARTMENT OF CHILDREN'S SERVICES

v.

### Juanita Kristin CULBERTSON.

### In the Matter of W.J.R.C. and S.D.H.

Court of Appeals of Tennessee, Western Section, at Nashville.

March 17, 2004 Session.

April 21, 2004.

Permission to Appeal Denied by Supreme Court July 19, 2004.

Susan E. McCown, Fayetteville, For Appellant, Juanita Kristin Culbertson.

Paul G. Summers, Attorney General and Reporter; Juan G. Villaseñor, Assistant Attorney General, For Appellee, State of Tennessee, Department of Children's Services.

## OPINION

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

This is a termination of parental rights case. Mother appeals from the order of the Juvenile Court of Marshall County, terminating her parental rights. Specifically, Mother asserts that the grounds cited for termination are not supported by clear and convincing evidence in the record. Because we find clear and convincing evidence in the record to support the trial court's findings, we affirm.

Juanita Kristin Culbertson ("Culbertson," "Mother," or "Appellant") is the mother of the two minor children at issue in this case, W.J.R.C. (d.o.b. 3/2/00) and S.D.H. (d.o.b. 4/21/01). The father of S.D.H. is Jason Dale Hippe ("Hippe").[1] Culbertson and Hippe are not married, but live together. The father of W.J.R.C. surrendered his parental rights as of Decem-

---

**1.** Hippe does not appeal from the Order terminating his parental rights. He is not a party to this appeal.

ber 20, 2002 and is not a party to this appeal.

In July 2001, the Department of Children's Services ("DCS," or "Appellee") received a referral that Culbertson and her children lived in a house that was dangerously filthy. Jana Dugger, a Child Protective Services worker with DCS, testified as follows concerning the conditions she encountered upon her investigation of the Culbertson house:

Q. What did you find when you went to the home?

A. The mother and the children were there, the children had black ears, black faces, their feet were black, there was ashtrays, cans—trash on the end table, the floors were dirty and there was some trash sticky, trashcans full.

 * * *

Q. After you saw the conditions of the home, was there anything else that concerned you?

A. Also an allegation had been made about lack of supervision. And we discussed that with the mother, that the child had been missing—in previous days the child had been missing for several minutes.

 * * *

Q. Were there any health concerns for these children?

A. Yes, at the time the baby [S.D.H.] was possible failure to thrive, [W.J.R.C.] had some asthma.

 * * *

Q. Did the mother smoke?

A. Yes.

Q. Was there a problem with her smoking?

A. There were—during one of the home visits in one of the pictures [Exhibit 1], the coffee table was covered with ashtray—ashtrays, butts and ciga-

rettes and [W.J.R.C.] would play in them. There were cigarette butts and ashes on the floor too.

Q. ... [W]ere there animals in the home?

A. Yes.

Q. And did those animals cause you any concern?

A. There was feces—there was a lot of feces and a lot—can't think of the name of the cat—there was a lot of feces in there; there were some feces on the floor.

DCS made several subsequent visits to the home and Ms. Dugger testified that conditions improved somewhat. Ms. Dugger testified that "Healthy Family" was already working with Culbertson and that DCS placed "Homemaker Services," "Family Support Services," and Child Development" services in the home. Despite these efforts, conditions at the home did not improve substantially and, on October 30, 2001, DCS filed a "Petition for Temporary Custody." A "Protective Custody Order" was entered that same day and S.D.H. and W.J.R.C. were removed from the home. A preliminary hearing was held on November 2, 2001, in which the children were found to be dependent and neglected. The children remained in protective custody following an adjudicatory hearing on November 6, 2001.

On November 27, 2001, "Permanency Plans" (the "Plans") were drafted for these two children and were signed by both Culbertson and Hippe on that same date. The Plans listed the duel goal of "Return Home" and "Adoption." In contemplation of the goal of reunification, the Plan set up scheduled visitation with the children and listed the following requirements and responsibilities for Culbertson:

1. ... [Culbertson] will maintain clean, sanitary and safe living conditions in her

home for a period of 4 consecutive months.... [Culbertson] will further understand that animal feces cannot be left where her children may come into contact with it. She must control this situation or remove all animals from the home.

2. [Culbertson] will understand that Homemakers are teachers placed in her home to show her how to become a better homemaker. Should Homemaking or other services be reinstated into her home [Culbertson] will cooperate with any and all requests of the worker. [Culbertson] will also participate in anger management counseling in order to better understand appropriate ways of dealing with anger. Within a period of 4 months [Culbertson] will present evidence of her participation in such counseling to DCS Child and Family CM.

3. Although it was reported that [Culbertson] did attend parenting classes, she needs to participate in further counseling for a better understanding of what child neglect is, how it adversely affects children, and what her parental responsibilities are. [Culbertson] will understand that failure to give her children daily baths and dress them appropriately in clean clothing is an invitation to infections and disease and a serious health hazard to her children. [Culbertson] will further understand her responsibility to know the whereabouts of, and to properly supervise her children at all times. [Culbertson] will also understand that failure to comply with the requirements of this permanency plan

may result in the termination of her parental rights.

4. [Culbertson] will acquire appropriate housing which is adequately furnished for herself and her children.... [Culbertson] will maintain such housing for a period of 4 consecutive months. DCS Child and Family Case Manager will determine the suitability of the housing. [Culbertson] will immediately notify the DCS Child and Family CM of any change of address and/or telephone number.

5. [Culbertson] will participate in a clinical interview administered by a licensed mental health professional to further explore issues related to these traumatic events and how or why they might affect her ability to give care and nurture to her own children.[2] This interview will take place within a period of 2 months and [Culbertson] will follow through to completion any recommendations resulting from this interview. [Culbertson] will further sign a consent for release of information so that DCS Child and Family CM may obtain information from the mental health professional pertaining to [Culbertson's] mental status.

6. [W.J.R.C.] will continue to receive therapy from Marshall CDC, or a similar facility located in the vicinity of the foster home, to assess whether he needs more therapy to achieve the level of development considered normal for a child his age. Any recommendations made by such facility will be followed.[3]

---

**2.** Culbertson was in foster care as a child in the state of Michigan. Her mother's parental rights were terminated in 1989. Culbertson was later adopted and has reported that she was molested by her adoptive father shortly before her 14th birthday. She was subsequently removed from her adoptive home and stayed in various foster homes until being

released from state custody shortly before her 19th birthday.

**3.** The CPS petition for custody stated that both W.J.R.C. and S.D.H. are developmentally delayed. S.D.H. was examined at Marshall County CDC and found to be on track developmentally. However, Marshall CDC was

On January 22, 2002, the Plans were ratified by Order of the trial court. During the time that the children were removed to State custody, Hippe and Culbertson had a falling out. According to Culbertson's testimony, she married Brian Penn on April 12, 2002 (eight (8) days after meeting him). Mr. Penn allegedly physically abused Culbertson and they separated sometime around July 2002. At the time of the hearing in this matter, Culbertson was still married to Mr. Penn, who, at that time, was incarcerated on prescription fraud charges. While still living with Mr. Penn, Culbertson began a relationship with a known sexual offender, Jason S. McCarty. On November 11, 2002, Culbertson gave birth to a third child, J.D.H. By the time J.D.H. was born, Culbertson and Hippe had reconciled. Culbertson testified that the father of J.D.H. could be either Hippe or Jason McCarty. On December 10, 2002, J.D.H., who is not a subject of this appeal, was removed from Culbertson's home because of unsanitary conditions in the household similar to those that led to the removal of W.J.R.C. and S.D.H.

On January 21, 2003, DCS filed its "Petition for Termination of Parental Rights" (the "Petition"), which sought to terminate the parental rights of Culbertson and Hippe to W.J.R.C. and S.D.H. The Petition reads, in relevant part, as follows:

## V.

Juanita Kristin Culbertson has not contributed to the child[ren's] support at any time since the children came into custody of the State of Tennessee. There is no evidence to show that Juanita Kristin Culbertson is not able bodied

and able to work to support these children.

\* \* \*

Juanita Kristin Culbertson was advised on November 27, 2001 that willful failure to contribute to the support of the children was grounds for termination of parental rights.

\* \* \*

The Petitioner therefore avers that ... Juanita Kristin Culbertson ... [has] abandoned [W.J.R.C.] and [S.H.D.] in that [she] has willfully failed to contribute to the support or make reasonable payments towards the support of said children for more than four (4) consecutive months prior to the filing of this Petition.

## VI.

The Defendant Mother, Juanita Kristin Culbertson, has not complied with the provisions of the permanency plan.... Specifically, she has not obtained or maintained a safe, stable and sanitary home.... She has not undergone a clinical interview conducted by a licensed mental health professional nor followed through with any recommendations made by the mental health professional. She has not demonstrated proper parenting techniques.

Juanita Kristin Culbertson was advised on November 27, 2001 during a staffing for the permanency plan that failure to comply with the permanency plan was grounds for termination of parental rights.

\* \* \*

The children have been removed from the custody of the parents for more than

working with W.J.R.C. at the time of removal. At the time the Plans were drafted, the foster parents reported that W.J.R.C. had learned to chew solid food and was rapidly learning to

speak (at the time of removal, he would only point and grunt). The foster parents also reported a dramatic decrease in W.J.R.C.'s head banging episodes.

six (6) months. The conditions which led to the removal of the children from the home still exist and other conditions exist which in all probability would cause the children to be subject to further abuse and/or neglect, making it unlikely that the children could be returned to either parent in the near future. The children were removed due to environmental neglect, specifically the home was filthy, with animal feces on the floors, dirty clothing and diapers strung throughout the house, cigarette butts and trash all over the floors, and the floors were black and sticky. In December 2002, the newborn sibling of these children was removed for environmental neglect with similar conditions. Specifically, the home was filthy; cat feces were on the floor, walls, bedding, etc., dirty clothes and bloody undergarments were on the floors, cigarette butts and trash were everywhere. During the time the children have been in custody, Juanita Kristin Culbertson has married and separated from her husband. She has entered into a relationship with a known sexual offender, Jason S. McCarty. . . . She has been unable to maintain a stable and sanitary home and has lived with known drug users. She has not been employed. . . .

There is little likelihood that these conditions will be remedied at an early date so that the children can be returned to Juanita Kristin Culbertson . . . in the near future.

The continuation of the parent or guardian and child relationship greatly diminishes the child's chance of an early integration into a stable and permanent home.

\*　　\*　　\*

## IX

Juanita Kristin Culbertson has not made an adjustment of circumstances, conduct or conditions as to make it in the child[ren's] best interest to return home in the foreseeable future.

Juanita Kristin Culbertson has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such a duration of time that lasting adjustment does not reasonably appear possible.

Juanita Kristin Culbertson has not paid a reasonable portion of the child[ren's] substitute physical care and maintenance or been financially able to do so.

Juanita Kristin Culbertson has not paid child support consistently with the child support guidelines promulgated by the Department pursuant to T.C.A. 36-5-101.

Juanita Kristin Culbertson has not demonstrated proper parenting ability.

A meaningful relationship has not otherwise been established between the child[ren] and Juanita Kristin Culbertson.

A hearing on the Petition was held on March 7, 2003. Following the hearing, the trial court entered its "Order for Termination of Parental Rights and Full Guardianship of Children," (the "Order") on March 31, 2003. The Order reads, in pertinent part, as follows:

Juanita Kristin Culbertson and Jason Dale Hippe have willfully failed to contribute to the children's support during the four months immediately preceding the filing of this Petition. They are both able bodied and able to work. . . . Jason Dale Hippe paid Juanita Kristin Culbertson child support while the children were in the custody of the State of Tennessee but Juanita Kristin Culbertson failed to pay any of that support to the State for the support of her children. . . . Juanita Kristin Culbertson

has not been employed at any time while the children have been in foster care. Juanita Kristin Culbertson has not made any payments to the State of Tennessee for the care of her children since the children were placed in State custody on October 30, 2001.

Therefore, the Defendants, Juanita Kristin Culbertson and Jason Dale Hippe, have abandoned the minor children, [S.D.H.] and [W.J.R.C.], in that they have willfully failed to contribute to the support or make reasonable payments towards the support of said children for more than four (4) consecutive months prior to the filing of the Petition to Terminate. That Juanita Kristin Culbertson and Jason Dale Hippe have failed without good cause or excuse, to make reasonable and consistent payments for the support of the children in accordance with the child support guidelines promulgated by the department pursuant to 36–5–101.

The children were removed from the parents, Juanita Kristin Culbertson and Jason Dale Hippe, as the result of a Petition filed in Juvenile court in which the children were found to be dependent and neglected as defined by T.C.A. 37–1–102 and the children were placed in DCS custody. The Juvenile Court found that the DCS made reasonable efforts to prevent removal of the children in that Homemakers, Home Ties, Marshall County Child Development Center and Family Support Services were place in the home to work with the parents prior to the removal. For a period of four (4) months following removal, the DCS made reasonable efforts to assist the parents, Juanita Kristin Culbertson and Jason Dale Hippe, to establish a suitable home for the children, but the parents have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the children to such a degree that it appears unlikely that Juanita Kristin Culbertson and Jason Dale Hippe will be able to provide a suitable home for the children at an early date. Therefore, the Defendants, Juanita Kristin Culbertson and Jason Dale Hippe, have abandoned [S.D.H.] and [W.J.R.C.].

The Defendant Mother, Juanita Kristin Culbertson, has not complied with the provisions of the permanency plan. The children were removed from the custody of the mother due to environmental neglect, lack of safe and sanitary housing; neglect of physical hygiene of the children; medical neglect, the developmental delay of one child and failure to thrive of the other child; and improper supervision. In December 2002, the newborn sibling of these children was removed for the same or similar conditions, including having cat feces throughout the house. The responsibilities in the permanency plan were reasonably related to the reasons why the children were removed from the custody of the parent. Specifically, the Defendant Mother has not obtained or maintained clean, safe and sanitary housing with appropriate furnishings for the children, she has not demonstrated an understanding that allowing her children to live in such filthy conditions poses a great risk to their health and safety; she has not demonstrated an understanding that animal feces cannot be left where her children may come into contact with it, that she must either control the situation or remove the animals from her home; she has not obtained or maintained employment or other legal means of supporting herself or her children; she did not complete parenting classes; she has not demonstrated that she has learned proper methods of parenting young children; she has not paid for the

support of the children; she has failed to protect the children from potentially dangerous situations by exposing them to sexual offenders; she had not completed anger management counseling; she did not complete counseling to understand what child neglect is [and] how it adversely affects children; and what her parental responsibilities are; she has not demonstrated an understanding that failure to give her children daily baths and to dress them in appropriate and clean clothing is an invitation to infection and disease; she has not demonstrated an understanding that it is her responsibility to know the whereabouts of and to properly supervise her children at all times; she has not demonstrated that she can effectively cope with her past traumas or as a parent; and she did not maintain regular contact with the Department of Children's Services.

\*　　\*　　\*

The children have been removed from the custody of their parents for more than six (6) months. The conditions which led to the removal of the children from the home of Juanita Kristin Culbertson and Jason Dale Hippe still exist and other conditions exist which in all probability would cause the children to be subject to further abuse and/or neglect, making it unlikely that the children could be returned to Juanita Kristin Culbertson and Jason Dale Hippe in the near future. Juanita Kristin Culbertson and Jason Dale Hippe have not demonstrated the ability to properly parent young children; have not maintained stable employment; have not maintained clean, sanitary, stable housing; have not demonstrated that they have made the necessary changes that would reduce the risk of their abusing or neglecting the children in the future;

they are unable to demonstrate that they have learned proper parenting techniques.... The parents did not do anything to remedy their situation and to regain custody of their children until the last couple of months and even then, they did not provide or furnish their own home. The Court cannot place children in a home and hope the parents will do right when they have not shown that they have done anything to regain custody of their children. These innocent children were not being taken care of by their parents and there is no proof that the parents can change, especially given that the newborn sibling of these children was removed for substantially similar conditions as those that existed at the time of the removal of these children.

There is little likelihood that these conditions will be remedied at an early date so that the children can be returned to either parent in the near future. There has been no proof that the parents can change any time soon.

The continuation of the parent and child relationship greatly diminishes the children's chances of an early integration into a stable and permanent home.

Juanita Kristin Culbertson and Jason Dale Hippe have not made an adjustment of circumstances, conduct or conditions as to make it in the children's best interest to return home in the foreseeable future.

Juanita Kristin Culbertson and Jason Dale Hippe have failed to effect a lasting adjustment after reasonable efforts made by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible.

.... Juanita Kristin Culbertson and Jason Dale Hippe associate with known

sexual offenders and allow these sexual offenders to be around the half-sibling of these children and [have] brought a know sexual offender to visitation of these children.

Juanita Kristin Culbertson and Jason Dale Hippe have not established a meaningful relationship with the children.

It is in the best interest of the children and the public that any and all parental rights that Juanita Kristin Culbertson and Jason Dale Hippe may hold to the children, [S.D.H.] and [W.J.R.C.], [be] forever terminated and that the complete custody, control, and guardianship of said children be awarded to the State of Tennessee, Department of Children's Services, with the right to place said children for adoption and to consent to adoption in *loco parentis*.

Culbertson appeals from this Order and raises four (4) issues for review as stated in her brief:

I. Whether the trial court erred in finding that, by clear and convincing evidence, Juanita Kristin Culbertson, abandoned her child[ren] by willfully failing to pay support within four months of the filing of the Petition to Terminate Parental Rights.

II. Whether the trial court erred when it concluded, by clear and convincing evidence, that there was substantial noncompliance with the responsibilities stated in the Permanen[cy] Plan[s] on the part of Juanita Kristin Culbertson.

III. Whether the trial court erred when it concluded by clear and convincing evidence, that pursuant to Tennessee Code Annotated § 36-1-113(g)(3)(A), that persistence of conditions existed.

IV. Whether the trial court erred when it concluded, by clear and convincing evidence, that it was in the best interest of the child[ren] that the parental rights

of Juanita Kristin Culbertson be terminated.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R.App. P. 13(d).

 T.C.A. § 36-1-113(c)(Supp.2003) governs termination of parental rights and requires that such termination be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination [of] parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interest of the child.

The trial court terminated Culbertson's parental rights on the following grounds, which are found at T.C.A. § 36-1-113(g)(Supp.2003):

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4.

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the

care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

T.C.A. § 36–1–102(1)(A)(Supp.2003) defines "Abandonment" as follows:

(1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37–1–102, and the child was placed in the custody of the department ... that the juvenile court found ... that the department ... made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department ... has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;

T.C.A. § 36–1–113(c) allows for termination of parental rights if any one of the grounds outlined in T.C.A. § 36–1–113(g) is found by clear and convincing evidence, and termination is in the best interest of the child. We have reviewed the entire record in this case and we find that the record is replete with evidence to support the trial court's finding that there is clear and convincing evidence of grounds for termination of Culbertson's parental rights and that termination of Culbertson's parental rights is in the best interest of W.J.R.C. and S.D.H.

### Abandonment Grounds

Pursuant to T.C.A. § 36–1–102(1)(A)(I) abandonment occurs when a parent has willfully failed to visit or support the child for a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent. As it applies to this case, abandonment is a parent's willful failure to pay more than token support in the four months preceding the filing of the petition to terminate parental rights. Culbertson argues that she did not willfully fail to support these children because no child support was ever ordered by the court or required in the Plans. In Tennessee, however, the obligation to pay support exists even in the absence of a court order to do

so. *See State v. Manier,* No. 01A01–9703–JV–00116, 1997 WL 675209, at \*5 (Tenn. Ct.App. Oct. 31, 1997) ("The statute does not require the parent to first be placed under a court order."); *see also In re Gordon (Webb v. Wilson),* 980 S.W.2d 372, 373–78 (Tenn.Ct.App.1998).[4]

■ Although the absence of a court order does not negate a parent's obligation to support his or her children, in order to safeguard a parent's fundamental right to the care and custody of his or her child, parental rights may not be terminated based on abandonment for failure to support unless clear and convincing evidence shows that the parent's failure to make reasonable payments toward the support of his or her child was willful. *See In re Swanson,* 2 S.W.3d 180, 184–85 (Tenn. 1999). Requiring a showing that the failure to support the child was willful allows "for the type of individualized decision-making which must take place when a fundamental right is at stake." *Id.* at 188. The issue, then, is whether Culbertson's failure to make any meaningful support payments within the four months preceding the filing of the Petition was "willful."

■ Failure of a parent to pay support under the termination statutes is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In re Adoption of Muir,* No. M2002–02963–COA–R3–CV, 2003 WL 22794524, at \*5 (Tenn.Ct.App. Nov. 25, 2003) (citing cases from other jurisdictions). "The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations.... Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct." *Id.*

The uncontested testimony in the record is that Culbertson paid no monetary support for these children from the time that they were removed from her home. Although Hippe paid some child support directly to Culbertson, those funds were never given to the State for the support of these two children. Concerning her own support of the children and how the funds that Hippe paid were used, Culbertson testified as follows:

Q. Didn't you [Culbertson] think that you needed to support your children?

A. I did support my children.

Q. Would you please tell me how you did when you paid no support at all—

A. I paid support—

Q. May I finish my question, please.

Will you please tell me how you supported these children when you did not pay any support the entire time that they were in State custody?

A. I bought them clothes that they needed; I did buy diapers for them, and they ended up being too small.

Q. Jason Hippe paid you child support even though your children were in State custody; isn't that true?

A. Yes, Ma'am.

Q. But you did not turn that money over to the State for the support of your children?

A. I used it for the children and bought them clothes; I bought their stuff that they needed with it and brought it to them.

---

4. T.C.A. § 34–1–102(a) states that "[p]arents are the joint natural guardians of their minor children, and are equally and jointly charged with their care, nurture, welfare, education, *and support ...*" (emphasis added).

Janice Flowers, the DCS case worker in this matter, testified that Culbertson "very rarely" brought diapers to their visitations. Concerning any clothing that was bought for the children, Ms. Flowers testified as follows:

Q. Have the parents brought clothing for these children?

A. Without looking at the record, I could not say. I believe that Jason [Hippe's] mother may have brought clothing at Christmas . . . but I could not swear to that. . . .

From her testimony, it is obvious that Culbertson was at least cognizant of the fact that she should provide support for these children. This is particularly true in light of the fact that Hippe tendered money to Culbertson specifically for the purpose of child support. From the record, there is simply not enough evidence to corroborate Culbertson's testimony that she used this money to purchase items for the children. Any items that Culbertson may have brought to visitation can only be viewed as token support in the context of this case.

Not only must a person be aware that they are obligated to support their children but, in order for abandonment to be willful, that person must also have the capacity to provide the support, make no attempt to provide support, and have no justifiable excuse for not providing the support. There is no evidence in this record from which we can conclude that Culbertson is not able-bodied. However, the uncontested evidence is that Culbertson has not held a job since her children were removed from the home (and even before that time). Concerning why she has not procured employment, Culbertson testified as follows:

Q. You [Culbertson] testified that you had manic depression?

A. Yes, Ma'am.

Q. Isn't this a life-long illness managed by medication?

A. It can be, but you can also get it under control yourself.[5]

Q. You aren't taking any medications; isn't that correct?

A. Yes, Ma'am.

Q. Do you have anything else wrong, any other physical problems?

A. No, Ma'am.

Q. Then why won't you hold a job down?

A. Lack of education and no ID.[6]

Q. So why don't you go back to school?

A. I've tried.

Q. How old are you?

A. Twenty-four.

In addition to her alleged manic-depression, and her lack of education, Culbertson also testified that she did not want to work because she was a "stay-at-home mom," to wit:

Q. And weren't you [Culbertson] told— heard repeatedly saying that you could not work because you were a stay-at-home mom?

A. I said, yeah, I wanted to stay at home, but I have a lack of education.

Q. Well, you didn't go back to school; did you?

---

5. There is nothing in the record, other than Culbertson's own testimony, concerning whether she has actually been diagnosed with manic-depression. Culbertson did testify that she was diagnosed with manic-depression by a Dr. Hill who had prescribed medication for her symptoms. Concerning whether she was taking her medication, Culbertson stated "I feel I don't need the medicine that he had me on. It made me angry. And I think it made me angry; it coincided with my anger."

6. Culbertson completed the eleventh grade and has no GED.

A. I tried. My depression got in the way.

Q. You said you were a stay-at-home mother, but you didn't have any children in the home; did you?

A. No.

From the record before us, it appears that Culbertson could have found some source of employment during the pendency of these termination proceedings had she truly been willing to do so. For the foregoing reasons, we find that grounds of abandonment by willful failure to support these children for four (4) months prior to the filing of the Petition to Terminate are met by clear and convincing evidence.

### Failure to Substantially Comply with Permanency Plans

■ Culbertson's requirements under the Permanency Plans are outlined, *supra*. The primary reason for removal of these children from the home was that the home and the children were filthy, that there were numerous hazards in that environment for the children, and that Culbertson had failed to protect the children from harmful circumstances. The Plans attempt to remedy these problems by requiring Culbertson, *inter alia*, to "maintain clean, sanitary and safe living conditions in her home for a period of 4 consecutive months," to "understand that failure to give her children daily baths and dress them appropriately in clean clothing is an invitation to infections and disease and a serious health hazard to her children," and to "acquire appropriate housing which is adequately furnished for herself and her children [and to] maintain such housing for a period of 4 consecutive months."

#### Sanitary conditions in the home

As discussed, *supra*, Culbertson gave birth to a third child, J.D.H. on November 11, 2002. Just one month after his birth,

J.D.H. was removed from Culbertson's custody. Concerning the conditions, which led to this removal, Lisa Polly–Voight, the DCS manager for the J.D.H. case, testified as follows:

> I went into the home and I found in the bathroom of the home there were women's bloody undergarments on the floor and used feminine products, there was garbage littering the floor like magazines, there was cat feces and cat litter with the cat litter box on the floor.

> In the living room area there were cigarette butts littering the entire floor, garbage, paper, old food wrappers on the floor, there were clothes everywhere. I was unsure if they were all clean or dirty. And over to the left side of the room there were—there was a large pile of boxes, clothing, just stuff. It's hard to describe, just a lot of boxes piled on top, thrown over there. And on top of all that there was cat feces on that. And it was a section about four and a half foot. It was almost as tall as me, about 5 foot tall, 10 foot across. There were dirty diapers on the floor.

> In the refrigerator there was mold, in the refrigerator there was a lot of—in the cabinets there was food like Doritos with a large hole that a rodent had eaten through it, it appeared to me. There was rodent droppings in the cabinets.

The fact that J.D.H. was found in conditions similar (and, indeed, the photographs depict even worse conditions) than those from which W.J.R.C. and S.D.H. were removed, is clear and convincing evidence that Culbertson failed to maintain a sanitary home pursuant to the permanency plans.

#### Personal hygiene for her children

In addition to being found in filthy conditions, Polly–Voight testified that J.D.H. "[h]ad a body rash on him and a really bad

diaper rash ....[h]e appeared to have dirty clothes on." The "body rash" was later diagnosed as scabies. The evidence clearly indicates that Culbertson had not changed her attitude toward the personal hygiene of her children since the removal of W.J.R.C. and S.D.H.

*Home for the children*

Under the Plans, Culbertson was required to provide a stable home for her children and to maintain that home for at least four (4) months. From the record, this requirement has not been met. Culbertson testified that she "cannot rent from housing authority because [she] got evicted from there [and] cannot get Section 8 for three years because [she] owe[s] housing $200–and–some." Following the eviction, Culbertson and Hippe lived temporarily with another couple, Patricia and J.L. Land. The Lands have one child who is currently in State custody, having been found dependent and neglected. Ms. Flowers testified that the Lands are drug users.

At the time of the hearing, Culbertson was living with a Ms. Josie Rinehart. According to Culbertson, she was introduced to Ms. Rinehart through her brother, William. Apparently, Ms. Rinehart cares for several elderly and disabled people in the home and some of those people live there, to wit:

Q. Okay. Let me—I'm a little confused, so let me see if I can understand this: In the home that you live at, Josie Rinehart lives there?

A. Yes, Ma'am.

Q. And you live there?

A. Yes, Ma'am.

Q. And Jason Hippe lives there?

A. Yes, Ma'am.

Q. And your [Culbertson's] mother lives there?

A. Yes, Ma'am.

Q. And this guy with Down Syndrome lives there?

A. Yes, Ma'am.

Q. And Grandmother Burk lives there?

A. Uh-huh.

Q. And Ms. Maggie lives there?

A. Ms. Maggie don't live there.

Q. And your brother had been living there too until just recently, as you testified?

A. He's been out of there for awhile now.

Q. How many adults live in this house?

A. Let's see; Momma's fixing to move out on the 17th of this month, so seven.

Q. So that's seven adults who live in a four-bedroom house.

A. (Nods head).

Q. Is that a yes?

 \* \* \*

A. Yes, Ma'am, there is.

 \* \* \*

Q. And this is Josie Rinehart's house?

A. Yes, Ma'am.

Q. It's not your house?

A. Yes, Ma'am.

Concerning whether and when she and/or Hippe might be able to procure adequate housing, Culbertson testified as follows:

Q. ... Would it be possible to get a home if you and Jason [Hippe] both had a full-time job?

A. Right now, no.

Q. So even if you both had a full-time job, you could not get your own—

A. We could not afford it right now. Right now we aren't even actually able to afford it even if I did work.

Q. And how would you be able to provide a fit and proper home for these

children if you can't get your own housing?

A. Because I've been trying to get my own housing.

Q. But you've been kicked out of public assistance housing; you've been barred from government housing; you have no job to get private housing. How would you be able to provide a home—

A. Because I am looking for a job now. I've been looking for a job.

Q. Ma'am, your children have been in custody for a year and a half and you have not gotten a job in that entire time. Why would you expect this Court to believe that you'd get one now?

A. Because I've got an application in at Wendy's. . . .

Q. So you're here today to have your parental rights terminated; you do not have a job, you do not have your own house, you have no income whatsoever.

A. Because I was told by the lady at Wendy's that she will call me. She has not called me yet.

Q. How can you expect this Court to believe that you would be able to provide for your children if you, in the entire time your children have been in custody, have not maintained a proper home, have not gotten a job, have not got any kind of income to support these children . . .

A. Because I can do it; and I know I can do it if I just had half the chance to be shown, to show that I can do it.

Unfortunately, it appears that Culbertson has had numerous chances to procure employment and housing but has failed to take advantage of these opportunities, even in the face of losing her children. There is clear and convincing evidence to support a finding that Culbertson has not obtained adequate housing for her children since their removal to State custody.

*Protection of children from harmful circumstance*

In its Order, *supra*, the trial court found that Culbertson "has failed to protect the children from potentially dangerous situations by exposing them to sexual offenders." Culbertson's brother, William, has a sexual offense conviction. The record indicates that William lives (or has lived) in the Rinehart house. At least one of the photographs, admitted into evidence in this case, shows William in Culbertson's home. In addition, Culbertson has brought her brother to her visitation with the children on at least one occasion. Concerning her decision to allow her brother access to the children, Culbertson testified as follows:

Q. But yet you exposed these children to know sexual offenders as well? You didn't protect them from known sexual offenders; did you?

A. Yes, I did.

Q. No, you didn't; you brought your own brother, who was a known sexual offender, to the visitation.

A. He was never left alone with the kids by himself.

Q. But you were supposed to protect them from all potentially dangerous situations. You did not do that, did you?

A. Yes, I did, because I know my brother wouldn't do nothing like that.

Dr. Louise Strang, a psychologist and qualified expert in this case, testified, in relevant part, as follows:

Q. Were you [Dr. Strang] able to form an opinion as to whether or not the children are at risk of further abuse and neglect if they were to be returned to [Culbertson's] custody.

A. If keeping people with criminal records, including sexual offender records, around one's child, that would be an indication that, yes, there's a risk of

harm. There's a general disregard for the protection of the children.

From the entire record in this case, we find that there is clear and convincing evidence that Culbertson has allowed her children to be exposed to potential danger by allowing her brother, a known sex offender, to live in the same house with her, and to visit with the children.

### Persistence of Conditions

As discussed in detail, *supra*, this record indicates, by clear and convincing evidence, that Culbertson has been unable to maintain a stable and sanitary home since the children have been removed from the home. The fact that the third child, J.D.H., was removed because of similar circumstances in the house, the fact that J.D.H. was infected with scabies, the fact that Culbertson is living in a home, not her own, with seven (7) other adults, and the fact that she has failed to obtain employment, despite no evidence in the record to suggest that she is not able-bodied, all indicate that Culbertson has not sufficiently changed her circumstances or conduct such that it would be in the best interest of these children to be returned to her.

Concerning whether there is any hope that Culbertson might be able to parent these children given the proper support, Dr. Strang testified, in relevant part, as follows:

THE COURT: I mean, isn't there something else that any of us can do or that the State can do [to assist Culbertson in being able to parent these children]?

\* \* \*

THE WITNESS: I guess one question I would have is has the State noticed anything or the Court heard anything that would say there is hope that these people [Hippe and Culbertson] are willing to work really hard. Parenting is the hardest job there is. And that if you're not rewarded by something, then you're not motivated by something, then there's nothing anybody can do to make you motivated. So I don't know of anything. I think this case is hopeless.

THE COURT: You think their situation is to be—with both parents is hopeless?

THE WITNESS: Yes. And I hate to say that too with regard to the children belonging with their natural parents.

THE COURT: And what makes it hopeless?

THE WITNESS: Their [Culbertson and Hippe's] character, their lack of ability, motivation, self-control, inner authority, outer authority, they don't respect authority, they don't have their own authority to guide them to make them do what they're supposed to do. Common sense; there's not a common sense even approach.

The record bears out Dr. Strang's observations and opinions concerning Culbertson's ability and/or motivation to change her life so that she can properly parent these children. At no point in this record, does Culbertson take any blame upon herself for the conditions in which she allowed her children to live, nor does she express any remorse. Despite reasonable efforts by DCS and other social services, Culbertson has not put forth the effort necessary to substantially change her living conditions. Furthermore, these children have been in State custody since October 30, 2001. Under T.C.A. § 36–1–113(g) and for the foregoing reasons, we find that the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home.

### Best Interest

The evidence in record indicates that these children have been placed in a stable foster home, where there is a potential

that they will be adopted. While in foster care, the children have overcome some of the developmental obstacles that they were experiencing at the time of their removal from Culbertson's home. They are well tended, clean, and safe. Because Culbertson's living conditions have not changed drastically since the children's removal, the record indicates, by clear and convincing evidence, that it is in the best interest of these children that Culbertson's parental rights be terminated.

For the foregoing reasons, we affirm the Order of the trial court, terminating the parental rights of Juanita Kristin Culbertson and Jason Dale Hippe to W.J.R.C. and S.D.H. Costs of this appeal are assessed against the Appellant, Juanita Kristin Culbertson, and her surety.