IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 26, 2011 Session

## IN THE MATTER OF: ALEX B.T.

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-08-1030    Walter L. Evans, Chancellor**

_____

**No. W2011-00511-COA-R3-PT - Filed November 15, 2011**

_____

This is a termination of parental rights case. The legal guardians of the child filed a petition to terminate Mother's parental rights based on her alleged willful failure to visit and support the child. The trial court found that Mother's efforts to visit and support had been frustrated by the legal guardians' actions. Therefore, the trial court concluded that Mother's failure to visit and support was not willful. Because the legal guardians failed to prove any of the grounds required to terminate Mother's parental rights, the trial court denied the petition. We affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Linda Lynn Walls Holmes, Memphis, Tennessee, for the appellants, Rondey M. and Rosalind M.

Victoria W. Gillard, Memphis, Tennessee, for the appellee, Jacquininia W. and Unknown Biological Father.

Gregory S. Gallagher, Memphis, Tennessee, Guardian Ad Litem.

### OPINION

### I. Background

The minor child Alex B.T.[1] was born on October 4, 2002 to Respondent/Appellee Jacquininia W. ("Mother"). Mother placed one man's last name on the child's birth certificate, but the child was later unofficially adopted by Mother's husband and Mother began referring to the child using her husband's last name.[2] However, later paternity testing proved that neither the man whose name was on the birth certificate, nor Mother's husband was the biological father of the child.[3]

Sometime in April 2003, Mother was incarcerated for domestic violence. Over the weekend while Mother was in jail, the child's maternal grandmother ("Grandmother") took possession of the child. While Grandmother was visiting her other daughter, an unrelated woman named Carolyn B. offered to help Grandmother care for the child while Mother was incarcerated. Subsequently, Rosalind M. ("Rosalind"), Carolyn B.'s sister, offered to care for the child in order to help Mother and Grandmother. Rosalind and her husband Rondey M. (together, "Appellants" or "Legal Guardians") proceeded to take care of the child on and off until an order giving the Appellants temporary custody was entered in 2003 in the juvenile court. At this time, Mother was awarded supervised visitation once a month with the child at Grandmother's home.

In 2005, the juvenile court returned the child to Mother's custody. However, Mother's ill health[4] made it difficult for her to care for the child. By order of June 8, 2006, the court found the child dependent and neglected and custody was awarded to the Appellants. Mother, however, retained "reasonable and liberal visitation" rights.

After the entry of the order in 2006, both the Appellants and Mother agree that Mother had no visitation with the child, nor did she provide any financial support for the child. While the Appellants argued that the failure to visit and support was willful, Mother asserted that she made several attempts to call, visit, and support the child financially, all of which were rebuffed by the Appellants.

On June 3, 2008, the Appellants filed a petition to Terminate Mother's and Unknown

---

[1] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] At the time of the trial, all the parties and the child's school records referred to the child with Mother's husband's last name, rather than the name on the child's birth certificate.

[3] The biological father of the child remains unknown.

[4] Mother suffers from Graves disease and, during this time, her illness became so serious as to require surgery to remove her thyroid.

Biological Father's parental rights and to adopt the child. A default judgment was entered against Unknown Biological Father and his rights were terminated by a supplemental order dated April 29, 2011.[5] After Biological Mother, acting *pro se*, filed an answer to the petition, an attorney was appointed for her by the court.

A hearing was held on December 8, 2010. During the hearing, Mother testified that she attempted to call the Appellants to speak with her son approximately 15 times per month; however, the Appellants either did not answer the phone, hung up on Mother, or informed her that the child was not available. Mother testified that, once when she called the house, Rondey returned the call and threatened her, telling her that "there's nothing down there that belong[ed] to [Mother]." Mother testified that she attempted to file an internal affairs complaint against Rondey, who is a Memphis Police Officer, but never followed through. In addition, Mother's other children often called the Appellants to speak with the child; usually the children were more successful in getting to speak with Alex. However, they were only allowed to speak with the child for short periods of time and, after one incident when the children allegedly called late at night, Rondey filed a police report against the children for making harassing phone calls. After that, Mother directed her children not to call the Appellants again.

Mother further testified that she had attempted to offer financial assistance to the Appellants, by purchasing the child's school uniforms and other items of clothing, but that she was informed that her help was neither wanted, nor needed. Mother testified that she was employed at the time of the hearing; however, she did not testify that she was employed in the four months preceding the filing of the termination of parental rights petition. In fact, Mother testified that she was not employed prior to October 2008 and that her unemployment was due to her illness.[6]

Mother also testified that, sometime after custody was temporarily given to the Appellants in 2006, she returned to juvenile court to request a rehearing. However, juvenile court personnel told her that she needed to wait six-months-to-a-year to file a petition for custody to be returned to her. According to Mother, she became ill at that time and was not able to return to court until after the petition to terminate her parental rights was filed, though she had yet to receive notice of the petition. Because of the filing of the termination petition,

_____

[5] The termination of Unknown Biological Father's parental rights are not the subject of the instant appeal.

[6] Attorney for the Appellants asked Mother if she was employed in October of 2008, which was four months after the filing of the petition to terminate Mother's parental rights. Mother was never asked whether she was employed during the four months preceding the petition. Mother did testify, however, that her illness made her unable to work for much of 2008.

the juvenile court dismissed Mother's petition to change custody pending resolution of this action in chancery court. Only at this point, Mother alleged, did she learn of the petition to terminate her parental rights, even though it had been filed months earlier.

Finally, Mother testified that her name was not put on any daycare or school documents, nor was the school informed that she had liberal visitation rights; consequently, she was not allowed to visit with the child. According to Mother, she only learned that the child was in a certain daycare center after she attempted to enroll another of her children there. Once Mother learned that the child was at that daycare, the Appellants immediately moved the child to a different daycare. On another occasion, in approximately October of 2010, Mother called the child's elementary school to arrange to visit him and was informed that her name was not on any paperwork indicating that she had the right to visit with the child. When this incident occurred, the school called Rosalind and she failed to inform the school that Mother was the child's biological parent or that Mother had the right to visit with the child. After speaking with Rosalind, the school called Mother back and told her she was not allowed to visit the child.

Rondey testified that he had never been home when Mother called to speak with Alex. In addition, he stated that he had never threatened Mother, but had called to tell her not to call his home late at night after returning from a weekend trip and seeing a call from Mother on the caller-ID at 1:00 in the morning. Rondey stated that no internal affairs complaint was ever filed against him by Mother. Further, Rondey admitted that he had filed a police report against Mother's other children, but only because the children had called late one night at around 2:00 in the morning.

With regard to his relationship with the child, Rondey testified that he has a close and loving relationship with Alex, that the child refers to Rondey as his father, and that the child has flourished under the Appellants' care. Rondey testified that he, his wife, and the child participate in many school, sports, and church activities and that, although the child has asthma, he is otherwise healthy and content.

Rosalind testified that the few times Mother has called to speak with the child, Mother was allowed to talk with Alex. However, Rosalind testified that Mother had not called in the four month period leading up to the filing of the petition to terminate parental rights,[7] nor has Mother attempted to visit the child since custody was returned to the Appellants in 2006. Rosalind also testified that she would have been happy to accept any financial support or

---

[7] Because of the confusion surrounding the date of the actual four month period at issue, is not clear whether Rosalind was referring to the correct four month period or the period surrounding October 2008, which was mistakenly considered the appropriate period at other points during the trial.

gifts for the child from Mother, but that none were ever offered.

Rosalind did admit, however, that Mother's name was never placed on any of the school documents to allow Mother to visit the child at school or daycare. Rosalind conceded that she was fully aware of the court order allowing Mother reasonable visitation, and, as a school principal, she was also aware that omitting Mother's name from school documents would result in Mother having no contact with the child at school. Nonetheless, Rosalind explained that Mother had only "sparingly" contacted the child and that the Appellants did not want Mother to see the child without coming to them first. Instead, Rosalind stated that, had Mother sought legal action against the Appellants (by, for example, petitioning court personnel or a guardian *ad litem* to "remind[]" the Appellants of the court order (even though Appellants admit that they were fully aware of Mother's visitation rights)), she would have allowed Mother to visit with the child.

Rosalind also testified that she has a close and loving relationship with the child, as does her daughter, who lived with the Appellants prior to going to college. Rosalind testified that the child does well in school and extracurricular activities, calls her his mother, although he knows that she is not his biological mother, and most likely would not recognize his biological mother should he see her.

Carolyn B. next testified about the unusual circumstances surrounding the child's placement with the Appellants. She further testified that she has never known Mother to visit with or call the child while she was at the Appellants' home. She also testified to the close bond that the child has with the Appellants, as well as to their good parenting skills.

Grandmother testified that she was on the phone on several occasions when Mother attempted to call the child. The majority of the time, Rosalind or Rosalind's daughter informed Mother that the child was not available. On one occasion, however, Mother was allowed to speak to the child, and according to Grandmother, the child told Mother that she was not his Mother and that his Mother had gone "far, far, far away." When informed that Mother was his biological parent, the child asked her to visit. Despite the request, Mother did not visit the child because Rondey allegedly cursed Mother and would not allow the visitation.

Finally, Mother's sister ("Maternal Aunt") testified that Mother had attempted, on numerous occasions, to visit with the child, going so far as to go to the Appellants' home accompanied by a police officer; however, the Appellants were never home or refused to answer their door. Maternal Aunt further testified that Mother purchased toys and clothes for the child at Christmas, but was not able to give the child the gifts because she was never able to contact the Appellants. Maternal Aunt did admit, however, that she, Grandmother, and

Mother all were aware of the Appellants' address and, instead of sending the gifts to the child in the mail, they gave the gifts to a needy family.

At the close of proof, the court found that the Appellants failed to prove, by clear and convincing evidence, either that Mother willfully failed to visit or willfully failed to support the child. The court found both Mother and Grandmother highly credible, but found the Appellants somewhat less credible. The court further found that the Appellants had interfered with Mother's right to visit with the child by refusing to allow visitation on the occasions that they were aware Mother was seeking to visit the child and failing to place her name on school records, which the court considered "an obvious attempt to deny [Mother] the opportunity to visit with this child." Further, the court found that Mother had made several attempts to provide support for the child, which were also "rebuffed by the Appellants," even though Mother was not aware that she was under any affirmative duty to give support to the child. Accordingly, the court found that the evidence did not establish that any of the required grounds for termination of parental rights existed and denied the petition to terminate Mother's rights. An order with the required findings of fact and conclusions of law was subsequently entered on December 28, 2010. The Appellants appeal.[8]

## II. Issues

1. Whether the trial court erred in finding that biological mother did not willfully abandon the child by failing to visit?
2. Whether the trial court erred in finding that biological mother did not willfully abandon the child by failing to support?
3. Whether the trial court erred in denying appellants petition to terminate biological mother's parental rights when the evidence was clear and convincing that the termination of parental rights was in the best interests of the minor child?

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state

---

[8] When reviewing the record on appeal, this Court concluded that the order appealed was not a final order, and therefore, not appealable as a matter of right, as the order denying the petition to terminate parental rights did not dispose of the Appellants' request to terminate Unknown Biological Father's rights. *See* Tenn. R. App. P. 3. Accordingly, this court entered an order requiring the Appellants to obtain a final judgment in this case lest their appeal be dismissed. On April 29, 2009, the chancery court entered an order terminating Unknown Biological Father's parental rights. This appeal is now properly before this Court.

may interfere with parental rights only if there is a compelling state interest. ***Nash-Putnam***, 921 S.W.2d at 174-75 (citing ***Santosky v. Kramer***, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re W .B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tenn. R. App. P. 13(d). As to the trial court's findings of fact, our review is ***de novo*** with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. ***See McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***See id.***; ***see also Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

**IV. Analysis**

Only one ground for termination of parental rights is at issue in this case—abandonment. *See* Tenn. Code Ann. § 36-1-113(g)(1). Abandonment is defined as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i). Willful failure to visit means "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation."[9] Tenn. Code Ann. § 36-1-102(1)(E). Willful failure to support means "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments[10] toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Therefore, for both the grounds of willful failure to visit and willful failure to support, the relevant period is four months prior to the filing of the petition to terminate parental rights, or in this case, from February 8, 2008 to June 8, 2008.

As a preliminary matter, we note that there was considerable confusion at trial regarding the relevant period; therefore, little evidence was presented regarding the period from February 8, 2008 to June 8, 2008. From our review of the record, the parties appeared to be operating under the mistaken impression that the relevant period began sometime around October 2008, which was four months after the filing of the petition. However, the law is clear that, in order to terminate parental rights, the abandonment must occur in the four months preceding the filing of the petition. *See* Tenn. Code Ann. § 36-1-113(g)(1).

To further complicate matters, the trial court heard testimony concerning the Appellants' actions prior to the relevant period to determine if those actions excused Mother's failure to visit and support. The Appellants do not take issue with the admission and consideration of this evidence on appeal. In addition, our research has shown that courts often consider events that occurred prior to the relevant period to determine if there was interference with the biological parent's attempts to visit or support the child. *See e.g., **In re**

---

[9] Token visitation means "visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. §36-1-102(1)(B).

[10] Token payments refers to "support, [which] under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. §36-1-102(1)(C).

***Adoption of A.M.H.***, 215 S.W.3d 793, 801 (Tenn. 2007) (considering legal guardians' actions prior to the relevant period to determine that there had been substantial interference in biological parents' visitation); ***In re S.M.***, 149 S.W.3d 632 (Tenn. Ct. App. 2004) (considering fact that mother informed father that the child was dead, even though the communication took place prior to the relevant period). Accordingly, this Court may only consider the period between February 8, 2008 and June 8, 2008 to determine if there was a willful failure to visit or support, but may consider prior actions to determine if a failure to visit or support during the relevant period was excused by the actions of others.

Turning to the substance of the Appellants' argument, the Appellants contend that the trial court erred in declining to find that Mother willfully failed to visit and support the child in the four months preceding the petition to terminate parental rights. Mother admits that she had no contact with the child during this period, but contends that the Appellants' interference with her visitation rights alienated her from the child and prevented her from exercising her visitation and supporting the child. Grandmother corroborated Mother's efforts to visit and speak with the child, as well as her efforts to give the child gifts. The trial court gave great weight to Mother and Grandmother, specifically finding their testimony credible.

## A. Willful Failure to Visit

The Appellants first argue that Mother's failure to visit was willful. They contend that Mother did not attempt to visit the child the entire time the child was in the Appellants' custody, much less in the four months preceding the filing of the petition. Mother argues that the Appellants' conduct interfered with her attempts to visit and excused her failure to do so.

In order to constitute a ground for the termination of parental rights, a failure to visit must be willful; regarding willfulness, the Tennessee Supreme Court has stated:

> We have held that when a parent attempts to visit his child but is "thwarted by the acts of others," the failure to visit is not willful. ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 810 (Tenn. 2007); *see **In re F.R.R., III***, 193 S.W.3d [528,] 530 [Tenn. 2006]. Thus, a parent's failure to visit is willful when it is "the product of free will, rather than coercion." ***In re Audrey S.***, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).
>
> * * *
>
> A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a

significant restraint or interference with the parent's attempts to visit the child. ***In re Audrey S.***, 182 S.W.3d at 864.

***In re M.L.P.***, 281 S.W.3d 387, 392–93 (Tenn. 2009). When applying this standard, this Court has stated:

> Conduct that amounts to a significant restraint or interference with a parent's efforts to support or develop a relationship with a child includes (1) telling a man he is not the child's biological father, (2) blocking access to the child, (3) keeping the child's whereabouts unknown, (4) vigorously resisting the parent's efforts to support the child, or (5) vigorously resisting a parent's efforts to visit the child.

***In re S.M.***, 149 S.W.3d 632, 642 n.18 (Tenn. Ct. App. 2004) (citing ***In re S.A.B.***, 735 So.2d 523, 524 (Fla. Dist. Ct. App.1999)). The trial court found that the Appellants had interfered with Mother's visitation so as to place a significant restraint on her ability to maintain a relationship with the child. Accordingly, the trial court concluded that Mother's failure to visit was not willful. According to the Tennessee Supreme Court, the determination of whether the failure to visit and support is willful is the province of the trial court. *See **In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003) ("Furthermore, we hold that the trial court is the proper court to make a determination of willfulness pursuant to Tennessee Code Annotated Section 36–1–102(1)(A)(iii)."). This Court has previously discussed the difficulty of determining willfulness:

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations . . . . Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

***Dept. of Children's Services v. Culbertson***, 152 S.W.3d 513, 523 (Tenn. Ct. App. 2004). The trial court based its ruling on Mother's and Grandmother's credibility. Credibility issues are best left to the trier-of-fact, and we will not overturn those finding absent clear and convincing evidence to the contrary. *See **Heffington v. Heffington,*** No. M2009-00434-COA-R3-CV, 2010 WL 623629, at *2 (Tenn. Ct. App. Feb. 19, 2010). Nothing in the record significantly detracts from Mother's or Grandmother's credibility or lends greater weight to the testimony of the Appellants; accordingly, we will not disturb the court's credibility findings.

Appellants cite several cases where the courts have concluded that the biological parent's failure to visit was not excused by the actions of third parties; however these cases

are distinguishable from the present situation. First, in *In re M.L.P.*, 281 S.W.3d 387 (Tenn. 2009), Father attempted to visit with his child early in the child's life but was told by the legal guardian that "I don't think it's a good idea right now." *Id.* at 393. After approximately eight calls, the Father never again attempted to see the child, even though he attended court hearings wherein Mother attempted to regain custody. *Id.* The Tennessee Supreme Court stated that "Father had no explanation . . . for his failure to take legal action or to request informal visitation . . . after he established paternity." *Id.* In contrast, here Mother and Grandmother testified that they tried repeatedly to call and visit with the child and were never allowed to do so.

In another case, *V.D. v. N.M.B.*, No. M2003-00186-COA-R3-CV, 2004 WL 1732323, (Tenn. Ct. App. July 26, 2004), this Court specifically stated that "Mother did not establish that she tried to visit but [legal guardian] obstructed the visit." *Id.* at \*6. Likewise in *In re DMD*, No. W2003-00987-COA-R3-PT, 2004 WL 1359046 (Tenn. Ct. App. June 17, 2004), this Court found that "although Mother testified to one unpleasant telephone conversation with [the legal guardians], this conversation does not support a determination that Mother was prevented or significantly hindered from visiting or maintaining contact with her children." *Id.* at \*5. In this case, given the trial court's credibility findings in favor of Mother and Grandmother, the evidence shows that Mother made numerous attempts to call and visit the child and her efforts to maintain a parental relationship were frustrated by the Appellants' efforts to limit her contact with the child.

We are concerned, as was the trial court, by the Appellants' failure to place Mother's name on any school/daycare documents and their corresponding refusal to allow Mother to visit the child at school and daycare. We note, however, that the trial court placed considerable emphasis on the episode where Mother attempted to visit the child's elementary school; this episode occurred after the filing of the petition to terminate parental rights, and, as such, is not evidence of interference prior to the petition.

Other evidence, however, shows that the Appellants did nothing to facilitate a relationship between Mother and the child. In fact, Rosalind testified that it was Mother's job to seek court action against the Appellants to enforce the court ordered visitation, even though she was fully aware of Mother's visitation rights. This Court has previously held that an adoption agency's position that the biological parent "litigate if he [or she] desired to develop a relationship with [the] child" was a substantial restraint on the parent's efforts to maintain a relationship with the child and the interference excused the biological parent's failure to visit. *In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004).

We conclude, from the totality of the circumstances, that the evidence shows an effort on part of the Appellants to interfere with Mother's right to see her child and that, as a result,

there was animosity between Mother and the Appellants. The Tennessee Supreme Court has held that antagonism between biological parents and legal guardians may excuse a failure to visit. *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) ("Where, as here, the parents' visits with their child have resulted in enmity between the parties and where the parents redirect their efforts at maintaining a parent-child relationship to the courts the evidence does not support a 'willful failure to visit' as a ground for abandonment."). The Appellants were clearly aware that Mother had been awarded reasonable and liberal visitation rights with the child, and their actions, especially with regard to refusing to place Mother's name on any school documents and filing a police report against the child's siblings for a single incident of late-night phone calls, created a significant restraint on Mother's ability to foster a relationship with her child.

The Appellants argue that Mother gave no time periods for her attempts to call or visit the child. Indeed, given the confusion over the time period, little to no evidence was presented regarding the relevant time period at the trial. However, the burden was on the Appellants to prove the grounds for termination by clear and convincing evidence. Rather than supporting a finding that Mother abandoned her child, the lack of evidence regarding the relevant period supports the trial court's finding that the Appellants had not met their burden. Given the high evidentiary burden in termination of parental rights cases, we conclude that the Appellants failed to meet their burden to prove, by clear and convincing evidence, that Mother's failure to visit was willful.

### B. Willful Failure to Support

The Appellants next argue that Mother's failure to support the child was willful. In order to determine whether the failure to support was willful, this Court has outlined the following guidelines:

> Failure of a parent to pay support under the termination statutes is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support."

*Culbertson*, 152 S.W.3d at 523 (quoting *In re Adoption of Muir*, No. M2002–02963–COA–R3–CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)). From our review of the record, there is no evidence that Mother was employed and thus had the capacity to pay support during the four months preceding the filing of the petition. A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child. *In re M.B.*, No. M2005-02120-COA-R3PT, 2006 WL 1082827, *5 (Tenn. Ct. App. Apr. 25, 2006) (citing *Pierce v. Bechtold*, 448 S.W.2d 425, 429

(Tenn. 1969)). The evidence shows that Mother suffers from a sometimes debilitating disease, which makes it impossible for her to work at times. Indeed, Mother testified that her unemployment prior to October of 2008 was due to her illness, which was uncontradicted at trial. Consequently, we cannot assume that Mother was able to provide support to the child in the four months preceding the petition to terminate her parental rights. The burden was on the Appellants to prove that Mother's failure to support was willful; by failing to present any evidence on her employment in the four months preceding the filing of the petition, they clearly have not met that burden.

## V. Conclusion

The only grounds alleged in the petition to terminate Mother's parental rights were abandonment by willful failure to visit and willful failure to support. Accordingly, we affirm the trial court's ruling that Appellants failed to prove any grounds for termination of Mother's parental rights by clear and convincing evidence. As such, we need not consider whether the termination is in the child's best interest. We note that no issues concerning a change of custody or visitation were entertained in the trial court; therefore our review is limited to the petition to terminate parental rights. The ruling of the Shelby County Chancery Court is affirmed. Costs of this appeal are taxed to Appellants Rosalind M. and Rondey M., and their surety.

_____
J. STEVEN STAFFORD, JUDGE

-13-