IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 15, 2013

IN RE S.J.W. ET AL.

Appeal from the Juvenile Court for Sullivan County
No. J 37860    Mark H. Toohey, Judge

No. E2013-00351-COA-R3-PT-FILED-JANUARY 28, 2014

T.R.D. ("Mother") and S.M.W. ("Father") appeal the termination of their rights to four minor children, S.J.W., B.H.D., J.E.W., and J.C.D. ("the Children"). The Department of Children's Services ("DCS") had been involved with the family since 2006. DCS received multiple referrals regarding environmental neglect and lack of proper care of the Children. DCS made efforts to assist the parents in providing the Children with suitable housing and basic physical and medical care. In August 2010, DCS received another referral alleging environmental, medical, and nutritional neglect. New services were provided without substantial improvement. In October 2010, the Children were removed from the parents' home and taken into temporary, protective custody. The following month, they were adjudicated dependent and neglected and placed in foster care. A year later, DCS filed a petition to terminate the parents' rights. Following a bench trial, the court found, by clear and convincing evidence, that multiple grounds for termination exist as to both parents and that termination is in the Children's best interest. Both Mother and Father appeal. We affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded

CHARLES D. SUSANO, JR.,P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Randall D. Fleming, Kingsport, Tennessee, for the appellant, T.R.D.

Nicholas A. Schaefer, Kingsport, Tennessee, for the appellant, S.M.W.

Robert E. Cooper, Jr., Attorney General and Reporter and Mary Byrd Ferrara, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Daniel J. Cantwell, Kingsport, Tennessee, Guardian ad litem.

**OPINION**

I.

Mother and Father were not yet married when the Children were born over a four-year span from December 2005 to August 2009. The young parents, neither of whom completed high school, struggled from the outset. They paid rent with the social security disability checks their oldest son received after he was diagnosed with leukemia. DCS's involvement with the family began when he was six months old. In March 2006, DCS received a referral regarding concerns of environmental neglect and lack of proper supervision and care of the minor children. Over the next three years, there were nine referrals, all focused on the Children's living conditions and their care and supervision. Early on, DCS referred the family for numerous services and provided resources and other assistance, as did community organizations, in an effort to assist Mother and Father toward the goal of providing appropriate housing and care for the Children. In addition to DCS's direct involvement, it referred services including a HUGS[1] nurse to the home since 2007; Tennessee Early Intervention Services which provided physical, speech, and developmental therapy, occupational services, and advanced home care in the home since 2007; and Palmer Center which transported the two oldest children to its school where their efforts focused on development of fine motor skills, speech, and communication. In addition, DCS linked the family with multiple community resources and organizations in an effort to obtain housing after the family was evicted from public housing in 2009. After the first two children were born, Mother initially worked at a fast-food restaurant but had difficulty maintaining a job as she was largely left to care for the Children on her own. Mother believed it was a mother's role to stay home and care for her children, but did not feel Father made much effort to find a job and support the family. For his part, Father was often absent from the home and in and out of jail. When he was present, case workers described him as being "okay" at times, while, at other times, hostile and in denial that there were any issues in the home. In 2009, the family was evicted from public housing because of their failure to pay rent. In 2010, a local church sponsored them and provided various items they needed as well as an apartment. When the family secured suitable housing – a primary area of concern – DCS closed their file.

---

[1]H.U.G.S. stands for "Help Us Grow Successfully." It is a state program provided to families through county health departments pursuant to which nurses visit families and provide assistance in their homes to keep children on track in their development.

In August 2010, DCS returned to the family's home on another referral alleging environmental, medical and nutritional neglect. Case workers observed a filthy, odorous home in "disarray" – the Children, in heavily soiled diapers, played and ate food off of the feces-stained carpet, dogs and cats were running about, and a litter pan sat on the dining table. The Children, then ranging in age from one to five, were not potty-trained. All were developmentally delayed, and the youngest, an infant, was diagnosed with failure to thrive. The oldest had leukemia that was in remission, but required monitoring. The Children could not speak discernable English and appeared to have developed their own way of communicating with each other. In addition to the multiple services already working with the family, the case manager referred Solutions Sources and two workers to provide in-home assistance with homemaking skills in a "last-ditch" effort to keep the Children at home with Mother and Father. No notable progress was made.

In October 2010, the Children were placed in the protective custody of DCS. In November 2010, they were adjudicated dependent and neglected and entered foster care. Following the Children's removal, Mother and Father stopped receiving government assistance and benefits for the Children. As a result, they were unable to pay rent, lost their apartment, and essentially became homeless.

DCS created a family permanency plan with both parents' input. The primary tasks assigned to Mother and Father were to obtain safe, stable housing and stable employment or other legal sources of income to support the Children. As time passed, maintaining contact and communication with DCS also became an issue. After the Children were removed, Mother and Father remained unemployed and continued their lifestyle of moving from one motel or boarding house to another. Because they owed substantial past-due rent, they were not eligible for public housing in the Kingsport area. In January 2011, they lived at the West Side Inn. In June 2011, they moved to the Model City Motel. Two months later, they lived in a "tourist" boarding home. In August 2011, they moved to Morristown where, with the help of a local church, they moved into an apartment and Father obtained work with a roofing company. He quit after some two months to return to Kingsport to face pending criminal charges. Since then, neither parent was employed, but both hoped to secure disability benefits. Father continued to incur new criminal charges and spend short stints in jail.

Over a year later, in December 2011, DCS filed a petition to terminate the parents' rights. In January 2012, Mother and Father got married. Mother indicated the primary reason she married Father was to secure help from churches and other religious organizations that did not provide housing assistance to unmarried couples.

The termination hearing took place over three days during September, October, and November 2012. By then, Father had been incarcerated for nearly eight months. A few days

before trial, Mother moved into a friend's apartment. She remained unemployed. The Children remained in foster care but had been separated into two different foster homes – the older boys lived in Rogersville and the younger two in Greeneville – after foster parents were unable to manage all four boys together. Upon first coming into DCS custody, the Children were severely developmentally delayed, had speech deficiencies, and required multiple services and therapies. After a year in foster care, two no longer required special services, while the youngest child was no longer considered "failure to thrive."

At the conclusion of the trial, the court terminated both parents' rights. In support of its decision, the court found that clear and convincing evidence established the existence of the following grounds for termination as to both: abandonment by non-support; abandonment by failure to provide a suitable home; substantial non-compliance with the permanency plan; and persistence of the conditions that led to the Children's removal. Also by clear and convincing evidence, the court found that termination was in the best interest of the Children. Mother and Father, represented by separate counsel, each filed a timely appeal.

II.

Mother presents issues for our review that we restate as follows:

> 1. Whether there is clear and convincing evidence that Mother abandoned the Children by failing to support them as a ground for termination.
>
> 2. Whether there is clear and convincing evidence that Mother abandoned the Children by failing to provide a suitable home for them as a ground for termination.
>
> 3. Whether there is clear and convincing evidence that Mother failed to comply substantially with the terms of a permanency plan as a ground for termination.
>
> 4. Whether there is clear and convincing evidence of persistence of conditions as a ground for termination.
>
> 5. Whether there is clear and convincing evidence that termination of Mother's rights is in the Children's best interest.

Father raises additional issues:

-4-

1. Whether Father's failure to support the Children in the four months preceding the filing of the termination petition was willful.

2. Whether DCS utilized reasonable efforts to reunify Father with the Children following their removal to DCS custody.

3. Whether termination of Father's rights is in the Children's best interest.

III.

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." T.C.A. § 36-1-113(c) (Supp. 2013); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

In cases involving termination of parental rights, we employ the following standard of review:

> [T]his Court's duty. . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. *Id.*; Tenn. R. App. P. 13(d). In weighing the

-5-

preponderance of the evidence, great weight is accorded to the trial court's determinations regarding witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See **Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741, 744-45 (Tenn. 2002).

IV.

Both parents challenge the trial court's finding that they abandoned the Children by failing to support them. Mother and Father concede that they have never paid child support for the Children. Mother suggests, however, that her failure to pay was not willful considering her limited resources. Father also contends that his admitted failure to support the Children was not willful given his lack of ability to maintain employment. Both point out that in May 2011, the child support referee ordered them to pay nothing pending a showing of medical proof to support their disability claims.

As relevant in this case, Tenn. Code Ann. § 36-1-113(g)(2) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

In turn, Tenn. Code Ann. § 36-1-102(1)(A)(I) (2010) defines "abandonment," in relevant part, as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

As to Father, who was incarcerated for some seven weeks during the relevant four months, the following definition of abandonment in Tenn. Code Ann. § 36-1-102 (1)(A)(iv) applies:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration. . . .

" '[W]illfully failed to support' or 'willfully failed to make reasonable payments toward such child's support' means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(D) and (E). The relevant four-month period immediately preceding the filing of the complaint in this case is August 11, 2011 through December 11, 2011.

This Court has elaborated on the element of willfulness in the context of termination proceedings:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

> *   *   *

> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts

-7-

"willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so.

*In re Audrey S*., 182 S.W.3d at 863-64 (internal citations omitted).

Returning to the case at bar, the trial court found that there was a willful failure to support:

[Mother and Father] were summoned to Child Support Court in regard to paying support for the . . . children. Both . . . stated . . . that they were seeking disability, and therefore the Referee did not order a support amount, but gave them time to produce medical proof of their disabilities which they never did.

The Court takes notice that the question is not whether they were ordered to pay support but rather were they able bodied and able to work and support the children, and the Court finds that [Mother and Father] were able bodied and able to work and support the children and they willfully did not do so.

[Father] testified that he was able to work and failed to make any child support payments because he had a problem with marijuana; and that he had difficulty maintaining a job due to his mental status.

\* \* \*

[Mother and Father] were on notice of the consequences of their failure to support the children as DCS made numerous notifications verbally . . . and in writing. . . .

At this juncture, we note that Father has only appealed the finding of abandonment by willful non-support. Therefore, he has implicitly conceded the existence of the other grounds found by the trial court. We proceed mindful that only a single statutory ground

-8-

must be clearly and convincingly established in order to justify a basis for termination. *In re Audrey S.*, 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

At trial, it was undisputed that neither parent paid any child support, nor had they provided non-monetary support, since the Children entered state custody some two years earlier. The permanency plan set out the address where Mother and Father should send their payments once an amount was ordered. In May 2011, the child support referee granted the parents 60 days to provide evidence of disability, but they failed to do so. "The fact that the parent was not under an order to pay support is not dispositive of the question of whether the failure is willful; the obligation to pay support exists in the absence of a specific order." *In re Mark A.L.*, No. M2013-00737-COA-R3-PT, 2013 WL 5536801 at *4 (Tenn. Ct. App. M.S., filed Oct. 4, 2013)(citing *Tenn. Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004)). We recognize "a parent cannot be said to have abandoned a child when his failure to support is due to circumstances outside his control." *Id.*, (citing *In re Adoption of Angela E.*, 402 S.W.3d at 640). In the present case, both parents participated in the creation of the permanency plan which clearly contemplated child support at an amount to be determined. Neither presented medical proof documenting their disability. Neither obtained disability benefits. In our view, the parents' failure to pay child support under these circumstances is not attributable to any "circumstances outside [their] control."

Neither parent provided evidence of an inability to work. As to Mother, the trial court was sympathetic to Mother's earlier plight when she was unable to work while often caring for the four young children by herself. The court observed, however, Mother had ample opportunity after the Children were removed to address her circumstances, beginning with her lack of income. Instead, at the time of trial nearly a year later, she remained unemployed and presented no proof of her efforts to secure work. Instead, she was seemingly fixated solely on her efforts to obtain social security disability benefits for a recently diagnosed anxiety disorder. Mother held down jobs in the past and there was nothing to indicate that she was unable to work in some capacity, particularly after the responsibility of caring for the Children was left to someone else. During her relevant four-month period, Mother obtained a job at Kentucky Fried Chicken but quit after just two days. Mother testified that her physician had indicated she did not qualify for disability status, and her claim had been denied and was pending appeal. Mother conceded she had recently been ordered to pay child support of $150 per month but had paid nothing.

As to Father, he informed his case manager that he had quit as many as 25 jobs in the past because he is nervous around other people. He admitted to panhandling and taking in $20-40 a day. Father was incarcerated on a probation violation for a portion of the relevant four-month period. Otherwise, he was admittedly employed by a roofing company in

Morristown during the summer of 2011, but quit that job in order to return to Kingsport. He left the job suddenly, without telling his employer, leaving little hope of regaining the job once his legal matters were resolved. Father also worked for a short time at one or two fast-food restaurants, but admitted he applied no part of his few paychecks toward child support. He attributed his failure to support the Children to a "marijuana problem."

In short, the proof shows that both parents were aware of their duty to support the Children and capable of working, but expended little effort to find and maintain a job or otherwise secure a legal source of income. On the record before us, we conclude that the evidence does not preponderate against the trial court's finding that Mother and Father willfully failed to support the Children. The trial court did not err in terminating the parents' rights on the ground of abandonment by failure to provide child support.

V.

The court further found that Mother failed to establish a suitable home for the Children. In this regard, Tenn. Code Ann. § 36-1-102(1)(A)(ii) further defines abandonment as a ground for termination:

> The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

The trial court made the following pertinent findings:

[A]t the time of removal the children were not in a suitable home in that there were animals in the home, there was animal feces in the home, the children were unable to communicate using the English language and had developed their own language, the children were developmentally delayed and were not being taken to Head Start.

Mother was overwhelmed by the situation as . . . Father did not assist her with the children, however, her efforts were not sufficient given her abilities and . . . she refused services and though she may have addressed one problem she let everything else go and created a dangerous living environment for the children . . . .

\* \* \*

DCS made reasonable efforts before the removal and during the time after removal to assist the parents in establishing a suitable home, and [Mother and Father] failed to make any reasonable efforts to establish a suitable home for the children[.] [T]hough there is no evidence that [Mother] abused drugs neither she nor [Father] have . . . secured a safe and stable home, [and] they have failed to secure a legal source of income. . . .

[Mother's] failure to make even minimal efforts to improve their living situation and personal conditions demonstrates a lack of concern for the children to such a degree that it appears unlikely that [she] will be able to provide a suitable home for the children at an early date.

The proof shows that DCS devoted considerable time, energy, attention, and resources in helping Mother and Father obtain and maintain a suitable home since they first began working with them more than four years before the Children were removed. As their case manager explained, the efforts of DCS included an emphasis on both parents finding jobs because they were not eligible for public housing and thus needed an income to pay for housing. Also to that end, both Mother and Father were encouraged to apply for their GEDs, but neither did. On questioning by the court, DCS conceded it could submit referrals to pay past due rent but had not done so because Mother and Father owed the housing authority some $1,200 – far above the $200 DCS could cover.

-11-

In 2009, after being evicted from public housing, the family moved to Ballis Tourist Home with help from the maternal grandmother. They lived together in one room. The case manager reported cramped conditions, no stove, a non-working toilet, and roaches. The parents did not actively cooperate with DCS's efforts for them to enter "ARCH," a homeless shelter program, and they did not keep an appointment for housing assistance through Interfaith Hospitality Network. Their case manager conceded that there were "not a lot of options available to them in the area," but noted that Mother and Father were opposed to leaving Kingsport for Johnson City or another nearby town with more housing options.

After Mother and Father moved to a Microtel motel, DCS again closed the case. Three days later, DCS received another referral for environmental neglect. Throughout this time, DCS continued to provide in-home services, but Mother refused additional services that DCS offered. In August 2010, the case manager connected Mother and Father with a church that provided the family with an apartment, furnishings, and other assistance. The case manager noted then that the Children were still in diapers and usually dirty or inappropriately dressed. She observed them "grunting" rather than speaking and described their circumstances as "very sad." The case manager testified that DCS was then close to removing the Children, but made every effort to keep the family together. Solutions Services brought in two workers that taught homemaking and parenting skills. The case manager personally visited the family after work several times a week because she worried about the Children. All the while, Mother "over and over and over" denied she needed any more help. The family seemed to have stable housing in the apartment and DCS again closed the case.

Despite being provided with cleaning supplies, the living conditions continued to be unsanitary, new animals were brought into the home, and the Children's development remained stalled. By October 2010, DCS had removed the Children, concluding that they were at risk in their parent's custody. As their last case manager put it, "there was no progress made and resistance. Like there was no understanding that this needs to change."

The evidence does not preponderate against the trial court's finding of persistence of conditions. The trial court did not err in terminating Mother's rights on this ground.

## VI.

Mother challenges the trial court's finding that she failed to comply with her responsibilities under the permanency plan. Her position is essentially two-fold: (1) She completed most of her assigned responsibilities and (2) any deficiencies are the result of DCS's failure to provide reasonable efforts to assist her.

Tenn. Code Ann. § 36-1-113(g)(2) provides that a ground for termination exists when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." As summarized by the trial court, the initial permanency plan gave Mother six months to accomplish certain required tasks:

> [M]aintain a legal source of income, maintain safe and stable housing, keep the home clean, cooperate with Solutions Source to develop homemaker skills, manage mental health, undergo a full psychological examination and comply with recommendations, and comply with assessments and sign releases with all providers to enable DCS to monitor progress.

Revised plans essentially reiterated Mother's responsibilities and afforded her additional time to complete them. As the court observed, DCS explained the requirements, Mother signed the plan, and the juvenile court approved the tasks as being reasonably related to remedying the conditions that necessitated foster care for the Children.

The court found that Mother "has not substantially complied with the responsibilities and requirements set out for her in the permanency plans." In particular, the court found that "[s]he has not maintained a legal source of income, not maintained a safe and stable home, not attended scheduled appointments, and she has not completed a mental health intake." The record reflects that the trial court properly summarized and considered the relevant evidence. In the year following the Children's removal, Mother completed few of the assigned "action steps." DCS referred her for a parenting assessment that included a limited mental evaluation, which she completed in December 2010. She failed to follow recommendations to complete a mental health intake and obtain regular mental health care. Mother explained that she took an "IQ test" and did not understand that anything else was required. For the most part, Mother also kept scheduled visitation appointments. The next year, no further progress was noted.

More importantly, Mother never achieved the plan's primary goals of obtaining an income source and a safe – that is, reasonably clean, – stable home for the Children. Her efforts at obtaining an income source were largely limited to her efforts to gain disability benefits. She, like Father, saw nothing wrong with the living conditions in the home. Mother agreed it could be a "little cluttered and a little dirty" at times, but asserted that those who testified to anything worse were lying. On our review, the evidence clearly and convincingly shows that Mother failed to comply substantially with the requirements of the permanency plan.

Lastly, the trial court expressly rejected Mother's position that DCS failed to make reasonable efforts to assist her in achieving the plan's requirements. The court found:

> DCS made reasonable efforts to help [Mother and Father] satisfy the requirements in the permanency plan because DCS scheduled a Child and Family Team meeting to discuss permanency and to develop a permanency plan, created and ratified the permanency plan, made referrals for parenting assessments, provided the contact information and paid for a drug and alcohol assessment, scheduled all supervised visitation, located suitable foster placement, scheduled and organized regular and necessary medical care, maintained communication with [Mother and Father] . . . , assessed [Mother's and Father's] situation and needs, placed service providers onto the case to assist [them] with parenting skills. . . .

The record reflects that, in addition, DCS workers assisted Mother despite their difficulty in maintaining contact with her as she and Father frequently moved. The trial court rejected Mother's assertion that she never understood the permanency plan. The court implicitly credited the testimony of the case manager that she personally reviewed the plan with Mother, broke the requirements down into simple steps, explained them to her again and again, and sometimes provided handwritten check lists with steps she needed to complete. Despite her claimed lack of understanding, Mother expressly admitted that she knew she was expected to obtain an income, and "get a place to live and keep it clean." Mother and Father became homeless when they stopped receiving government assistance and benefits for the Children after losing custody of them. She testified that, since then, she had not found a job because she was waiting to be approved for social security disability benefits and believed they would "come through." Mother testified that she was capable of researching newspaper ads to find affordable rental homes and had rented in the past. Because public housing was not an option, DCS additionally connected the family with churches and other housing assistance through which they obtained an apartment and furnishings. Even then, Mother and Father proved unable to maintain a suitable living environment. Mother offered no reason for her failure to keep a safe, sanitary home even when the older two children were enrolled in preschool and she was not working outside the home.

This Court has often acknowledged that "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H*., 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006) (citing *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004); *State*

***Dep't of Children's Servs. v. Demarr***, No. M2002-02603-COA-R3-JV, 2003 WL 21946776, at *10 (Tenn. Ct. App. M.S., filed Aug. 13, 2003)). We have further observed, however, that

> the manner in which the Department renders services must be
> *reasonable*, not herculean. In addition, the Department is not
> required to shoulder the burden alone. The parents must also
> make reasonable efforts to rehabilitate themselves and to remedy
> the conditions that required the removal of the children.

***In re Bernard T***., 319 S.W.3d 586, 601 (Tenn. Ct. App. 2010)(internal citations omitted; emphasis added). The reasonableness of the DCS's efforts should be decided on a case-by-case basis in light of the unique facts of the case. ***Id***. In the present case, the evidence does not preponderate against the trial court's finding that Mother failed to make any concrete, significant progress in completing the permanency plan steps. This is particularly true as to obtaining an income and safe, stable housing. The trial court did not err in terminating Mother's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

VII.

Tenn. Code Ann. § 36-1-113(g)(3) provides a ground for termination, commonly referred to as "persistence of conditions":

> The child has been removed from the home of the parent or
> guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other
> conditions that in all reasonable probability would cause the
> child to be subjected to further abuse or neglect and that,
> therefore, prevent the child's safe return to the care of the
> parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be
> remedied at an early date so that the child can be safely returned
> to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child
> relationship greatly diminishes the child's chances of early
> integration into a safe, stable and permanent home . . . .

-15-

In support of its termination order, the trial court found that the conditions which led to the Children's removal continued to persist, making a return to Mother's custody impossible. The court stated, in relevant part:

> [T]he parents are still without a home, a legal source of income, they still lack the basic parenting skills to meet the basic needs of the children . . . , they have no transportation. . . . The parents have failed to take advantage of the resources offered by DCS to assist them prior to removal, prior to filing the petition to terminate parental rights, and after the filing of the petition to terminate. . . .
>
> The Court finds that there is little chance that those conditions will be remedied soon so that the children can be returned safely to the home because, for the past twelve . . . months[,] DCS made reasonable efforts to help [Mother] remedy them, to no avail.
>
> \* \* \*
>
> [W]hat has been proven is that for these children's entire lives prior to custody they were bounced from motel room to apartment and back again with no place to call home. Every time DCS became involved with the family it was because their home was absolutely nasty, filthy, and presented a clear danger for the children. [The parents] claim that was due to the number of children and their developmental disabilities. The Court finds contrary because when the situation was bad enough for DCS to become involved then the house would be cleaned, groceries would appear, and the parents would find employment but as soon as DCS close a case the family would quickly return to filth, no jobs, no home, and place the children back in the same dangerous situations as before.

The Court concluded that "continuation of the parent/child relationship greatly diminishes the children's chances of being placed into a safe, stable and permanent home." Following our review of the evidence, we agree.

-16-

In our view, Mother all but conceded that conditions persist which prevented the Children from being returned safely to her custody. Near the end of her testimony, Mother stated:

> Nothing has changed within the last two years. I'm not asking for my kids back. I'm asking for . . . my rights not to be terminated because what's not changed . . . it doesn't mean that it can't be changed within the next week or the next month, me finding a job and getting a place to live.

Unfortunately, the lack of any notable progress by Mother in the two years since the Children were removed does not inspire confidence that Mother is actively engaged in anything more than wishful thinking. Stated differently, we see no reason to join in her apparent belief that a better life lies just around the corner. If anything, Mother's situation has deteriorated – she was on her own, had no income, no home of her own, no car, and had never demonstrated serious effort or motivation to tackle any of these issues for the benefit of the Children or herself.

The evidence preponderates strongly in favor of the trial court's finding of persistence of conditions. Accordingly, the trial court did not err in terminating Mother's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

VIII.

Father asserts that DCS failed to provide reasonable efforts to assist him in completing his responsibilities in the permanency plan so that he could be reunited with the Children. Citing his "utter lack of resources" and "extremely low IQ," Father concludes that DCS "should have shouldered greater responsibility in assisting him with completion of the required tasks. . . ."

We earlier set out the manner in which DCS, over an extended period of years, applied its specialized skills, experience and resources to assist Father and Mother to establish a stable home and appropriate living environment for the Children. In addition, the case manager offered to personally transport Father (and Mother) for any reason related to completing a task in the permanency plan. At trial, Father contended that DCS never explained the permanency plan to him despite proof that it was created with his input. Morever, he signed the plan to indicate his understanding and acknowledgment of its requirements and the consequences of failing to satisfy those requirements. Each time the plan was revised, Father was afforded additional time to meet his responsibilities. Instead, as the Children lingered in foster care, he continued his old ways, incurring new charges and

this time landing in jail to serve the better part of at least a year. Father had not held a steady job since 2011, and seemed resigned to "maybe walk around and mow lawns." He indicated to his case manager, however, that his difficulty was not so much with finding jobs, but in keeping them for any length of time because of his anxiety issues. Again, Father did little to address any such personal problems. In 2010, DCS referred Father for a psychological evaluation at Frontier Health. He acknowledged, but failed to follow through with, the resulting recommendations that he undergo a full psychiatric consultation, receive individual therapy, obtain alcohol and drug treatment, attend family therapy, attend parenting education courses, and receive in-home services. With respect to conditions in the family's home, Father largely denied there were any issues with any of the places they stayed. He added that none of the in-home service providers "really talked to [him] ever." He admitted, however, "I was usually in the background just watching if I was there." He further admitted he usually left when they arrived because he "didn't want to deal with them." Father's lack of interest, effort, and involvement, before and after the Children's removal, is telling. "Although the Department bears a heavy responsibility with regard to reunification, the road to reunification is a 'two-way street.' " *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). In the present case, it does not appear that Father traveled very far down his side of that street.

In our view, the proof shows that Father did virtually nothing to help himself but expected Mother, DCS, or someone else, to take responsibility for providing a suitable home and appropriate care and support of the Children. Father admitted that before the Children were removed, he was away from home several nights a week because he found it stressful. Father testified that "blowing off steam" was a priority then, but claimed he was now a changed man. He believed the church would help him find a job, but offered that he would "get out there if I have to." We conclude that DCS provided reasonable efforts to guide, encourage, and assist him in meeting his responsibilities under the permanency plan. In the two years since the Children were removed, however, Father made minimal efforts of his own toward reunification. As one case manager observed, after 14 months, none of the pressing issues were resolved or showed any improvement – "no housing, no income, no transportation, no means of communicating. . . ." This issue is without merit.

IX.

Our review leads us to conclude that there is clear and convincing evidence to support the multiple grounds for termination found by the trial court. Guided by a non-exclusive set of statutory factors set forth in Tenn. Code Ann. § 36-1-113(i), we next review the court's

finding, also said to be made by clear and convincing evidence, that termination is in the best interest of the Children.[2]

---

[2]The factors are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The trial court made extensive findings in support of its best-interest determination. We summarize them as follows:

> [T]hey have not made changes in their conduct or circumstances that would make it safe for the children to go home. Their situation has become worse since the children have come into custody. They live a transient lifestyle and [Father] has a substantial list of criminal charges consistent with vagrancy.
>
> [T]hey have not made lasting changes in their lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible.
>
> [C]hanging caregivers at this stage of their lives will have a detrimental effect on them. The children have now been able to meet their developmental milestones and they are well bonded to their foster parents.
>
> [T]hey neglected the children by failing to meet their needs [and] each of the children have suffered social, physical and verbal delays resulting in severe developmental delays.
>
> [Mother's and Father's] mental or emotional state would be detrimental to the children and would prevent them from effectively parenting. . . .
>
> [T]hey have not paid child support consistently.
>
> [T]hey have shown little or no interest in the welfare of the children.
>
> [T]he children have developed a strong bond with their foster parents, who wish to adopt them.
>
> [T]he parents are homeless and without income or transportation. Both parents have exhibited poor insight and very poor parenting skills.

DCS removed the Children in October 2010 out of "grave concern for the children's well-being and safety." The removal came after some four years of efforts, resources, and

assistance were expended in an effort to guide Mother and Father toward providing a safe, suitable living environment and otherwise meeting the Children's most basic needs. Significantly, because the parents had never obtained stable housing after the Children were gone, they never demonstrated that they had acquired the skills necessary to maintain a clean home. At the time of trial, Father remained in jail and Mother had just moved in with a friend. Their circumstances were otherwise virtually unchanged. Nothing in the proof at trial inspires confidence that the Children could soon be returned to Mother's and Father's custody. The proof indicated that the Children were doing well in foster care despite being placed in two separate homes. The Children's profound developmental delays were being addressed, they were receiving much-needed therapy and their medical and nutritional needs were being met. As the trial court put it,

> these parents are not really bad actors in the sense that they're out to hurt their children. They're just not tak[ing] care of them unless somebody is watching them.

The trial court concluded that too much time had passed with no prospect for improvement in the foreseeable future. We agree. Looking at the termination decision from the Children's perspective, as we must, there is clear and convincing evidence to show that their interest is best served by permanently severing Mother's and Father's parental rights.

X.

The judgment of the trial court terminating the parental rights of Mother and Father is affirmed. Costs on appeal are taxed to the appellants, T.R.D. and S.M.W. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE