# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 28, 2014 Session

## IN RE V.L.J. ET AL.

**Appeal from the Circuit Court for Blount County**
**No. E-24813      Tammy M. Harrington, Judge**

_____

### No. E2013-02815-COA-R3-PT-FILED-DECEMBER 30, 2014

_____

This is a parental termination case.  It focuses on the three children of a married couple, D.G.B. (Mother) and D.C.B. (Father), and Mother's child (V.L.J.) from an earlier relationship.  The four children came into the custody of the Department of Children's Services (DCS) in 2009.  Nearly four years later, DCS filed a petition to terminate the rights of the parents.  Following a trial, the court granted the petition based upon its finding (1) that multiple grounds for termination exist and (2) that termination is in the best interest of the children.  Both findings were said by the trial court to be made by clear and convincing evidence.  Mother and Father appeal.  We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Andrew O. Beamer, Knoxville, Tennessee, for the appellant, D.G.B.

John T. Sholly, Knoxville, Tennessee, for the appellant, D.C.B.

Robert E. Cooper, Attorney General & Reporter, and Kathryn A. Baker, Assistant Attorney General, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

At the center of this case are four minor children – siblings E.B., I.B., and S.B., and their older half-sister, V.L.J.[1] (collectively, the Children). Mother and Father are the parents of the younger three children, and Father is the stepfather of V.L.J. In 2008, Mother, Father and the Children moved to Tennessee. DCS first became involved with the family in March 2009. V.L.J., then nine, threatened to commit suicide. In response, Mother admittedly handed the child a knife and encouraged her to "go ahead" and do it. Mother explained it was her attempt at "reverse psychology." Following the incident, DCS took V.L.J. into temporary, protective custody, and placed her in foster care. In the course of its ensuing investigation, DCS discovered that Mother had an outstanding felony warrant out of Texas. She was arrested, extradited and subsequently incarcerated there from April 2009 until September 2010.

In Mother's absence, Father maintained custody of the three remaining children. In July 2009, DCS received a referral alleging that Father had physically abused I.B. E.B. corroborated his brother's assertion that Father was responsible for red marks observed on I.B.'s back and neck, including a hand-shaped print. In its petition for temporary custody, DCS further alleged that, in Father's care, the children were living in "deplorable" conditions. More specifically, DCS alleged that their home was filthy, with trash everywhere and feces on the floors. Father's rent was three months past due. The Children were removed into protective custody. In juvenile court, they were adjudicated dependent and neglected after Mother and Father waived a hearing and stipulated that the children were dependent and neglected based on their living conditions.[2]

After all four children had entered state custody, a DCS team, together with Mother and Father, developed permanency plans. The first plans, one for V.L.J. and another for the other three children, were implemented in 2009 and had a goal of reunification or exit custody with a relative. Several revised plans followed that essentially contained the same requirements. Generally summarized, Mother and Father were required to obtain and maintain appropriate housing; promptly notify DCS of any changes in circumstances; attend the Children's various appointments; obtain and maintain transportation and insurance;

---

[1]In the same proceeding, the trial court terminated the parental rights of V.L.J.'s biological father, J.J., whom the child had never met. At the time the petition was filed, J.J. was incarcerated for attempted murder and child abuse. He did not participate in the termination proceeding. His case is not before us.

[2]Father denied physically abusing I.B.

obtain and maintain a legal income source for at least six months with verification provided to DCS; provide child support; participate in mental health assessments; follow all related recommendations and provide verification to DCS; follow all court orders; address any legal issues; refrain from any illegal activity; and avoid any new criminal charges. In addition, the plan required Father to complete anger management classes and provide documentation to DCS, while Mother was required to complete an alcohol and drug assessment; submit to random drug screens; and remain drug-free. Mother and Father signed the plans as well as the criteria and procedures for termination that were provided to them. In 2011, the plans were consolidated into a family plan covering all four children. Between 2009 and the time of trial in 2013, the plan was updated five times. With the exception of a plan dated October 3, 2012, each plan was approved by the trial court, which expressly found that "the responsibilities outlined in the plan are reasonably related to the achievement of the goal, are related to remedying the conditions which necessitated foster care, and are in the best interests of the [Children]."

In the summer of 2009, within weeks of the Children's entry into foster care, Father moved to Texas. He failed to notify DCS of his move. While in Texas, Father drove a truck for a concrete company for over seven months and completed anger management classes. In prison, Mother completed her GED and kept in contact with the Children by writing letters to them as often as she could. After serving eighteen months, she was released in September 2010. By November 2010, Mother and Father had returned to Tennessee. They moved from place to place – from the home of Father's brother, to a one-bedroom and then a two-bedroom apartment. Back in Tennessee, Father completed parenting classes and underwent a mental health assessment which made no further recommendations.

A revised permanency plan dated January 2011 noted that the "parents do not have a stable home, income, transportation or a concrete plan to obtain these essential items." In August 2011, Mother was ordered to pay child support. By September 2011, two years after the initial permanency plan was established, Mother was employed and she and Father had found housing. Transportation remained an issue and each was advised to maintain the progress they had made, and avoid any new legal/criminal issues or otherwise engage in illegal activity. The September 2011 revised plan expressly stated: "Should . . . each of the parents fail to fully complete any and all of the tasks set forth in this Plan . . . [DCS] will finalize in seeking permanent homes for each of the children." Mother and Father signed to indicate their understanding of and agreement with the plan. In ratifying the plan following a November 2011 hearing, the juvenile court found that both parents were then in substantial compliance with the plan requirements, but noted that the lack of a transportation plan still presented a barrier to the Children exiting foster care.

In March 2012, Mother twice failed drug screens administered by DCS. The next

month, Mother left Father and moved back to Texas. According to Mother, she did so because her case worker had advised her that she would never regain custody of the Children if she continued to live with Father. She remained in Texas until August 2012. On her return to Tennessee, their case worker, Ms. Haley, met with Mother and Father and personally reviewed the latest revised plan with them. Mother refused to submit to a drug screen at the meeting. At trial, Ms. Haley testified that Mother told her she had been on various drugs while in Texas. At the time of the meeting, Mother and Father were unemployed and did not have stable housing. Since Mother had returned from Texas, she and Father briefly lived in a tent in a friend's backyard, then moved into a motel, and finally leased a room from an elderly man to whom they provided assistance. The latter home, located on Grandview Avenue, was, by all accounts, unsuitable for the Children. Mother testified that despite their efforts at cleaning, the smell of cat urine lingered. In October 2012, both parents, who had been regularly visiting the Children, were granted unsupervised visits. Some weeks later, the privilege was revoked after Mother failed a drug screen.

On January 16, 2013, DCS filed a petition to terminate parents' rights. At that time, Mother and Father continued to reside in the Grandview Avenue home for several more months. Father, who had been unemployed since leaving Texas three years earlier, had just begun working for the same company as Mother. In February 2013, Father was ordered to pay child support.

Trial began in September 2013. At that time, the Children ranged in age from six to fifteen. All four had been in state custody since 2009. Mother denied that she was using marijuana, but tested positive for the substance on the first day of trial. Between the time the petition was filed and the time of trial, both parents became employed and moved from Grandview Avenue to a suitable home. In June 2013, Mother enrolled in an intensive outpatient drug treatment program. She said she had recently seen a mental health counselor and had an appointment to see a psychiatrist in November 2013.

After trial, the court found, as to Mother, that she abandoned the Children by failing to support them and that she failed to comply substantially with the terms of the parenting plan. As to Father, the court found these same grounds plus abandonment by failure to provide a suitable home and persistence of conditions applied. The court further determined that termination of both Mother's and Father's rights was in the Children's best interest. Mother and Father, represented by separate counsel, filed timely notices of appeal.

II.

Mother and Father each filed an appellate brief. They present issues for our review which we have restated slightly. As to Mother, the issues are as follows:

1. Whether the trial court erred by terminating Mother's parental rights for failure to pay child support.

2. Whether the trial court erred by terminating Mother's parental rights for failure to comply substantially with the permanency plan.

3. Whether there is clear and convincing evidence to support the trial court's finding that termination of Mother's parental rights is in the best interest of the Children.

Father presents the following issues:

1. There is insufficient evidence to support the trial court's finding that multiple statutory grounds exist to terminate Father's parental rights.

2. The trial court erred in terminating Father's rights on the ground of "persistence of conditions" absent a finding of dependency, neglect, or abuse based on clear and convincing evidence.

3. The trial court erred by finding that it was in the Children's best interest to terminate Father's parental rights.

III.

With respect to parental termination cases, this Court has observed:

It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be established by clear and convincing evidence. Evidence

-5-

satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S.*, E2011-00517-COA-R3-PT, 2011 WL 4553233 at *11-12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011) (citations omitted).

On our review, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's determinations of witness credibility, which will not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002). We proceed mindful that only a single statutory ground must be clearly and convincingly established in order to justify a basis for termination. *In re Audrey S*., 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

IV.

As earlier noted, the trial court found that multiple grounds for termination exist as to both Mother and Father. As previously noted, they each challenge the sufficiency of the evidence to support grounds for termination. Two grounds are applicable to both parents –abandonment by failure to provide child support and substantial non-compliance with a permanency plan. With respect to these grounds, Tenn. Code Ann. § 36-1-113 provides as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
>
> (2) There has been substantial noncompliance by the parent or

guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(1), (2). In turn, Section 36-1-102, for purposes of subsection (1), defines "abandonment," in relevant part, to mean that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of a parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the a parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i). Further, "token support" means that the support, under the circumstances of an individual case, is not significant considering the parent's means. *See* Tenn. Code Ann. § 36-1-102(1)(B). We examine the grounds for termination in light of the proof at trial.

## V.

## A.

We focus on the ground of abandonment by failure to pay child support. *See* Tenn. Code Ann. §§ 36-1-113(g)(1); 36-1-102(1)(A)(i). In the present case, the four-month period for purposes of establishing abandonment by non-support is September 16, 2012 until January 15, 2013, the day before the petition was filed.

## B.

The trial court found that Mother "abandoned the [C]hildren to the foster care system by failing to support the [C]hildren." In support of its finding, the court stated:

There are four children in custody, and the amount paid by [Mother] is around $40 in the four months prior to the filing of this petition. Based upon the testimony as to [Mother's] employment history, the Court finds that she willfully did not

support the [C]hildren and made token payments. . . . The Court
also finds by clear and convincing evidence that she was advised
of the consequences of a failure to support.

Mother was ordered to pay child support of $423 per month, or $105.75 per child, to begin in September 2011. The payment history reflects that, during the relevant four months leading to the filing of the termination petition, Mother paid $41.97 per child, for a total of $167.88 for all four children. Mother does not dispute the payment record, but submits that the amount paid is not a "token" amount and that her failure to pay more was not willful because she was unemployed during part of the time in question.

At trial, Mother testified that in September 2012, she returned to Tennessee and resumed her employment at Waffle House. She had held the same job for over a year in 2011. Mother testified that she left Waffle House at the end of November 2012 because, she said, her boss was "stealing from the company." The proof thus shows that even while she was earning an income, Mother paid zero child support in September, $21 per child in October, and $14.75 per child in November. In this manner, and despite being aware that the Children remained in state custody and that termination was a potential consequence of her failure to provide support, Mother chose to voluntarily quit working. Even so, Mother was without work for only about a month before she started a new job, with D & S Residential, on January 3, 2013. During this time, Mother paid $5.69 per child in December 2012. In January 2013, she paid nothing.

The evidence does not preponderate against the trial court's finding that Mother failed to meet her child support obligation or, at best, made only sporadic, token payments. Clear and convincing evidence exists to support the trial court's finding of abandonment by failure to pay support as a ground for terminating Mother's parental rights.

## C.

With respect to Father, he worked in Texas during 2009-10, and thereafter was unemployed until 2013. He testified that during that time, he applied for 30 jobs a week, including trucking companies and fast food places, and "nobody was hiring." In January 2013, prompted by Mother's employment, Father applied and was hired by the company by whom she was employed.

Father does not dispute that he paid nothing during the critical four months. Instead, before this Court, he asserts that he was unaware that he had to pay child support until he was ordered to do so. In February 2013, a month after the petition was filed, Father was ordered to begin paying child support of $420 per month, or $140 for each of his three children. At

that time, Father had been employed for about a month and began paying as ordered with the payments being deducted from his wages.

The position Father takes on appeal contradicts his testimony at trial. He was cross-examined regarding his awareness of his child support obligation as follows:

> [Counsel for DCS]: [Father], did you not think you ought to be paying child support for your children prior to February of 2013?
>
> [Father]: Yes, I thought I should be, but nobody ever said for me to do it.
>
> [Q]: But you knew you should have been paying support?
>
> [A]: Yes.
>
> [Q]: And you didn't do it?
>
> [A]: No.

"In Tennessee, . . . the obligation to pay support exists even in the absence of a court order to do so." *State v. Culbertson*, 152 S.W.3d 513, 523-524 (Tenn. Ct. App. 2004) (citing *State v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn. Ct. App. Oct. 31, 1997)) ("The statute does not require the parent to first be placed under a court order."). In *Culbertson*, we elaborated on a parent's duty of support, as follows:

> Although the absence of a court order does not negate a parent's obligation to support his or her children, in order to safeguard a parent's fundamental right to the care and custody of his or her child, parental rights may not be terminated based on abandonment for failure to support unless clear and convincing evidence shows that the parent's failure to make reasonable payments toward the support of his or her child was willful.
>
> * * *
>
> Failure of a parent to pay support under the termination statutes is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing

-9-

the support." "The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations…. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct."

**Culbertson**, at 524 (internal citations omitted). In the present case, the trial court found that Father willfully failed to provide child support. The court stated:

This case has been going four years, and the only support that has come in only came in after the filing of the termination petition.

[Father has] done a lot, but as far as the issue of support, there hasn't been anything. And I do find it incredible, the testimony about the number of applications and not being able to find a job.

And further it is now obvious based upon the testimony that he was able to be employed. During this four-year period of time this could have happened, and it did not until the petition was filed, and I find that extremely significant. Four years is a long time to give him a chance to do what he only did after the petition was filed.

In weighing the preponderance of the evidence, great weight is accorded the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See **Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). The proof at trial showed that Father was able-bodied and otherwise capable of being employed, as demonstrated by his work history before and after the filing of the petition. He was admittedly aware of his duty to support the children, but chose not to secure a job and make payments.

The evidence does not preponderate against the trial court's findings in support of its conclusion that Father abandoned the children by his willful failure to pay child support throughout the four years leading up to the filing of the petition. The trial court did not err in terminating Father's parental rights on the ground of abandonment by non-support.

VI.

A.

The trial court terminated both parents' rights based on its finding that they failed to comply substantially with the permanency plan. At trial, DCS presented evidence of the 2009 initial plan as well as multiple revised versions that contained essentially the same requirements. At the time the plan was revised in July 2010, Mother remained incarcerated and Father had followed her to Texas. As to strengths, the plan noted that Father "loves his children," and is bonded with them, maintains regular contact with DCS, does not abuse alcohol or drugs, completed his mental health assessment and parenting classes, had supervised contact with the children and had been "a great support for [Mother] in the past in helping her straighten up her own life." As for Mother, she completed her GED in jail and wrote letters to the children as often as possible.

The trial court found that the parents did not have reliable transportation. Regarding other responsibilities, Mother and Father were ordered to provide documentation reflecting the disposition of all criminal cases and were ordered to participate in family therapy with the Children. Mother was charged with going to DCS to schedule a mental health assessment. A revised plan, dated September 2011, included the requirement for both parents to abide by any child support orders. This plan added adoption as a permanency goal. The plan noted that Mother and Father had secured housing, but had not yet lived in the home for six months; and Mother was employed, but the parents "continue to struggle with finances and transportation." The parents were charged with maintaining their newly obtained housing and employment, working vigilantly toward a consistent transportation plan, and completing the steps outlined in earlier plans, including resolving and refraining from incurring new legal/criminal issues; refraining from engaging in any illegal activity; and completing required assessments and classes, with verification to DCS.

In April 2012, Mother moved back to Texas, where she remained until returning to Tennessee in August. Upon her return, she and Father met with Ms. Haley, who personally reviewed an updated plan with them. In September 2012, Mother returned to her job at Waffle House, but then quit two months later. In October 2012, Mother and Father met with DCS and Ms. Haley again and the plan requirements remained essentially the same. The plan noted that Mother had paid only "minimal" child support and Father had paid none. As strengths, the plan noted that the parents were "united" in their relationship again, that V.L.J. was cooperative in counseling, and that Father had "cleared up all legal issues." At the same time, Mother had just been jailed again, the parents had been unable to maintain appropriate, stable housing or employment, and they had not secured reliable transportation. In addition, the plan noted that Mother needed to remain sober and drug free.

-11-

The final revised plan was dated May 2013. At the time, both parents were employed and had appropriate housing. Father and Mother continued to live together, and Mother admitted to illegal drug use and had failed a drug screen on a court date that month.

B.

We quote pertinent portions of the court's findings. As to Mother, the court stated:

> Specifically, all the permanency plans included in one way or another that there was appropriate housing to be maintained and that transportation was to be stable. [Mother] was to participate in a mental health assessment, follow the recommendations, . . . and maintain negative drug screens, and also she was to enter and successfully complete an intensive out-patient program. Preceding the filing of this petition the Court does find that there was not appropriate housing; there was not stable housing; the mental health assessment had not been completed; that IOP has only been entered into May of 2013; and that she has not abstained from using illegal substances. The Court also finds by clear and convincing evidence that [DCS] made reasonable efforts to assist [Mother] in the permanency plan.

In further support of its finding that Mother failed to comply substantially with the permanency plan requirements, the trial court addressed the fact that Mother had made progress with the plan since the petition was filed. The court observed:

> And so I find that by clear and convincing evidence as far as [Mother] that there has been substantial noncompliance with the Permanency Plan that relates to all four children.
>
> The Court's concerns as far as – I understand that [Mother] is employed now. I understand that there has been testimony that there is stable housing, and . . . that she is in intensive out-patient.
>
> [W]hat is most concerning for the Court is that it appears that she is capable apparently of doing the things that were on the Permanency Plan.

However, these children have languished in custody for four years before that was demonstrated. And the problem that the Court has with that and the finding that she's not been in substantial compliance is, to paraphrase, it's too little too late.

The children came into custody at a very young age. There has been multiple attempts, even despite her incarceration periods, to have effected the goals that were on the parenting plan.

Turning to Father, the trial court credited him with doing "just about everything that was asked of him – "the Mental Health Assessment, he did it; parenting class, he did it; visitation, is doing it," and "[c]ounseling; he was there." The court found, however, that leading to the filing of the petition, "there was substantial noncompliance . . . once again with housing and transportation." In its final order, the court elaborated that the lack of stable and suitable housing, stable employment, and transportation were the issues "that brought the children into state's custody and the biggest safety risk . . . ." The court thereby found clear and convincing evidence of Father's failure to comply substantially with the permanency plan.

C.

We have reviewed the court's findings in light of the entire record. We conclude that the evidence does not preponderate against the trial court's finding that both Mother and Father failed to comply substantially with the permanency plan. In this Court, both parents suggest that this ground was not sufficiently proven because, at one point, both DCS and the trial court considered them to be in substantial compliance with the plan. They point to the plan dated September 2011, which stated that "Mother and Father have completed most tasks on previous plans" and were cooperative in working with DCS toward the goal of promoting the Children's best interest. At that point, the parents were essentially charged with maintaining the progress they had made, forming a plan for consistent, safe, and legal transportation, and working on any ongoing responsibilities such as completing all assessments and following recommendations, paying child support, and implementing parenting techniques they had learned. On ratifying the plan in November 2011, the juvenile court found that Mother and Father were in substantial compliance, but noted that the lack of transportation remained as a barrier to the Children being returned at that time.

Beginning in early 2012, much of Mother's and Father's forward momentum was seemingly lost. In March 2012, Mother failed two random drug screens. She then quit her job and moved back to Texas. Otherwise, throughout the pendency of the case, Mother and Father remained together. After Mother returned in August, she and Father had no income,

no stable housing, and still, no reliable transportation. Mother never completed a mental health assessment and neither parent attended the younger children's counseling and therapy sessions. Both parents regularly visited the Children and were granted unsupervised visitation in October 2012. Within weeks, the privilege was revoked afer Mother failed another drug screen. Mother's return to employment was also short-lived; she was employed again at Waffle House in September 2012 and quit in November. Around the same time, Mother and Father rented space in the Grandview Avenue home, but it was unsuitable for the Children.

As we see it, the compliance required with a permanency plan is that which is necessary to overcome the reasons that children are removed from a parent and placed in foster care. Regaining custody requires parents to complete certain tasks and maintain compliance with the plan to the point that it is appropriate and safe to return the children to them. In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where "return to parent" is the goal, parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis. In the present case, Mother and Father fell short when they failed to maintain the significant strides they had made.

The evidence suggests that by the time of trial, some four years after the Children were removed, Mother and Father had made some recent progress. As the trial court found, however, it was by then simply "too little, too late," to require these children to start over again with no assurances that the parents' latest changes in circumstances would last. Based on the foregoing, we conclude that the evidence does not preponderate against the trial court's finding that there was substantial noncompliance with a permanency plan by both Mother and Father as grounds for terminating their respective rights to the Children.

Lastly, as to this issue, Father asserts that DCS failed to use reasonable efforts to assist him and Mother to make it possible for the Children to be returned. The proof at trial belies Father's assertion. Initially, DCS provided in-home services to assist Father with budgeting, grocery shopping and cleaning. Ms. Haley took over as the family's case worker in November 2011. Prior to that time, DCS on three occasions provided Mother and Father financial assistance to pay their utility bills. When DCS denied later requests for more money, Ms. Haley contacted local churches and community organizations for assistance. In addition, she made repeated referrals for an alcohol and drug assessment for Mother, and provided information to Mother by which she was able to undergo one at no cost. Ms. Haley twice procured housing applications and hand-delivered them to Mother and Father; took Mother and Father to pay their bills; and supervised visits with the Children.

For his part, Father testified that he could not recall receiving housing applications from Ms. Haley or DCS sending anyone to his home to help with budgeting, cleaning or shopping. Father did acknowledge that DCS provided help with the payment of the family's utilities. Father points out that in the November 2011 order ratifying the permanency plan, the juvenile court stated that the "issue of whether DCS made reasonable efforts from December 2010 and March 2011 is reserved." The court did not further elaborate but, in the same order, found that DCS, Mother, and Father were in substantial compliance with the permanency plan. Moreover, the court found that, through the services or referrals it was providing, DCS was "making reasonable efforts toward finalizing the permanency goal(s)" of returning the Children to Mother and Father or to exit custody to live with a relative.

The evidence supports the trial court's finding that DCS utilized reasonable efforts to assist the parents toward regaining custody of the Children. Ultimately, Mother's and Father's own efforts failed to match the assistance, knowledge, and encouragement that DCS provided, and they were unable to maintain any sort of stability in their lives until it was too late.

## VII.

### A.

The trial court terminated Father's rights on two additional grounds – abandonment by failure to provide a suitable home and persistence of conditions. We address each ground in turn.

### B.

Pursuant to Tenn. Code Ann. § 36-1-113(g)(1), as further defined in Section 36-1-102(1)(A)(ii), abandonment by failure to provide a suitable home means that:

> The child has been removed from the home of . . . a parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the

circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist [] a parent or parents or a guardian or guardians to establish a suitable home for the child, but that the parent or parents or a guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

In the present case, the applicable period is the four months after the younger three children's removal – July 21, 2009 until November 21, 2009.[3]   The trial court found as follows:

The children . . . were removed from the physical custody of [Father] for environmental neglect.  His plan and his issues involved safe, suitable, and clean housing.  First and foremost, when the children first came into custody or soon thereafter [Father] moved to Texas so there was no suitable home here in the state of Tennessee to be evaluated.  Once he returned with [Mother] . . . they lived in a tent followed by a hotel and then the house on Grandview.  The Court finds by clear and convincing evidence that none of these places constitute suitable housing for children.  The Court also finds by clear and convincing evidence that [DCS] did make reasonable efforts to assist [Father] in obtaining suitable housing including giving him housing applications, helping with bills, etc.

As the court observed, the children were removed from Father's care as a result of living conditions described as "deplorable" and "filthy."  Father conceded that soon after the children were placed in foster care, he moved to Texas.  Clearly, this decision left Father

_____

[3]In his brief, Father incorrectly focuses on the four months immediately preceding the filing of the termination petition.

-16-

unable to establish a suitable home for the children in Tennessee, and there was no evidence to suggest that he did so in Texas. When he finally returned, with Mother, in 2010, appropriate housing remained a primary obstacle to the reunification of the family. Fast forward two more years, and Mother and Father were living in a room in the Grandview Avenue house surrounded by cats and the "horrendous" stench of cat urine. At trial, Mother corroborated Ms. Haley's testimony that the home was not suitable for the children.

The evidence does not preponderate against the trial court's finding that Father abandoned the children by failing to provide them with a suitable home in the months after they were removed to foster care and for years afterward. The trial court did not err in terminating Father's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1), as further defined in Section 36-1-102(1)(A)(ii).

C.

The trial court terminated Father's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3), on the ground commonly referred to as "persistence of conditions." That section provides as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the a parent or parents or a guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the a parent or parents or a guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Father takes the position that this ground cannot support termination of his rights because there is no underlying finding of dependency, neglect, or abuse to support its application. In short, we disagree. Father correctly recites the law: "Tenn. Code Ann. §

-17-

36-1-113(g)(3) applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005). He is incorrect, however, when he contends that no such finding exists here. The record before us contains an April 2010 hearing order in which Mother and Father waived an adjudicatory hearing following the removal of the younger three children. The order provides, in relevant part, as follows:

> The Parties waive the Adjudicatory Hearing and agree that there is clear and convincing evidence . . . to sustain the emergency removal and admits that the Department could substantially prove the allegations in the Petition and that the child or children were dependent and neglected at the time of the removal.
>
> *   *   *
>
> The father denies the allegations of physical abuse. . . . The father admits the children were dependent and neglected due to the conditions of the house at the time of the removal.

We think the hearing order certainly qualifies as a judicial finding of dependency and neglect based on clear and convincing evidence. We next consider the sufficiency of the evidence of persistence of conditions. Regarding Father, the trial court found that "during the period of time that is almost the four years that the children have been in custody that the significant issue that really brought them into custody persisted . . . the lack of an ability to maintain stable employment and provide a home and support . . . ." As we have already discussed, DCS allowed the parents some four years to achieve and maintain the level of stability needed to bring the children home. In that time, Father failed to obtain suitable housing, an income, or transportation. And, as the trial court repeatedly emphasized, Father continued to stand by Mother, rather than standing up for the children. The trial court returned to the subject of persistence of conditions as a part of its determination of the children's best interest. The court observed:

> As far as [Father] is concerned, whether he has made an adjustment of circumstance, conduct or conditions to make it safe and in the [children's] best interest to be in the home of the parent . . . .
>
> *   *   *

I really go back to that when the children were young, two, three and five and [Mother] . . . went into custody, [Father] maintained for awhile. But then when the children went into custody, he went to Texas, and he went to her instead of staying here with the children.

As so I go back to that to sort of look to determine is he going to fix the issue of knowing that she abuses drugs, knowing that she has failed these drug screens, knowing that their supervised visitation is tied together, knowing that he lost his unsupervised visitation because of her, knowing that all of these issues continue to persist. . . .

\* \* \*

I think he's done a good job of really trying to maintain by attending the counseling sessions[4] and attending visitation and really trying, but it just doesn't get there. It just doesn't hold for the Court that an adjustment enough has been made to his circumstances in housing and his circumstances with [Mother] and her issues to make it safe or in their best interests to be in that home.

At trial, Father testified that he would leave Mother and move to his own home with the children if that was required. In our view, the trial court implicitly rejected Father's testimony based on his conduct the last time he chose to join Mother rather than working to resolve the issues that forced the children into foster care.

The evidence does not preponderate against the trial court's finding of persistence of conditions as a ground for terminating Father's rights. Between the time the petition was filed and the trial, Father became employed and was thereby able to pay child support as ordered. At the same time, suitable housing continued to be a question – although the new home he moved into may have been otherwise suitable for the children, Father and Mother continued to live there together, and there was no evidence to show that Mother had ended her long-term drug habit. The trial court did not err in terminating Father's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

---

[4]The proof at trial indicated that Father had attended nearly all of V.L.J.'s counseling sessions, but not those of the other three children.

VIII.

Having found clear and convincing evidence that grounds for termination exist, we next review the trial court's determination of the Children's best interest. Our review is guided by reference to the non-exclusive list of statutory factors set out at Tenn. Code Ann. § 36-1-113(i). The stated factors are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional

status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In undertaking its "best interest" analysis, the trial court considered each parent individually. The court expressly found that factors (1), (2), (4), (7), and (9) applied in favor of terminating both Mother's and Father's parental rights. We summarize pertinent portions of the court's findings:

First, based on Mother's continued use of drugs, the trial court had "no difficulty in finding by clear and convincing evidence that [Mother] has not made such an adjustment of circumstance, conduct or conditions as to make it safe and in the [Children's] best interest" to be in the parents' home. *See* Tenn. Code Ann. § 36-1-113(i)(1). The court found that this factor applied equally to Father. Despite Father's admitted awareness of Mother's continuing drug use, and its effect on his own rights to and relationship with the Children, the court found that "there's been no adjustment made by him whatsoever . . . to put the [C]hildren before [Mother]."

Regarding factor (2) – whether the parents had effected a "lasting adjustment," the court similarly found that "again, there's not been any significant time that anything has been maintained. Efforts that were made by social service agencies have not been taken advantage of to the full extent they could have, and the proof bears that out."

Next, the court found that neither parent had a "meaningful" relationship with the [C]hildren. While particularly acknowledging Father's regular contact and visitation with the Children, the court further found as follows:

> These children have had someone there to take care of their daily needs, the schoolwork, the feeding, the clothing, the maintaining of the home, the setting of the boundaries, but that meaningful relationship as far as those things that we think of as the normal parental role has been the role of the foster family. That has not been the role of the biological parents.

The court further found that neither parent had created a physical living environment that was healthy and safe for the Children. As to Mother, the court found that "there has

been a consistent history of the use of controlled substances on behalf of [Mother] to the point that even when she got unsupervised contact she was not even able to abstain from the use of drugs to maintain that for any significant period of time." As to Father, the court pointed to "a consistent history of the use of controlled substances on behalf of [Mother] which is criminal activity and [Father] has had knowledge of it." Lastly, the court reiterated its finding that neither parent had consistently paid child support. Based on the evidence at trial, and the recommendations of the Guardian ad litem, the trial court found that termination of both parents' rights was in the Children's best interest.

In our view, the evidence paints a picture of two parents who undoubtedly love their Children, but could not maintain stability in their own lives to the point that they could bring the Children home. Nearly four years after the first child entered foster care, and the other three soon followed, Mother and Father were unable or unwilling to remain employed, provide a safe, suitable home and transportation system for the Children, or provide child support. In other areas, Mother demonstrated that her drug use continued, and Father simply accepted it. Moreover, Mother refused throughout the case to seek a mental health assessment and treatment. For his part, Father seemingly placed his relationship with Mother above his responsibilities for the Children. Just after they went to a foster home, Father left Tennessee for Texas, where they both remained until Mother was released from prison. In 2012, Father, along with Mother, lost his right to unsupervised visits with the Children at home after Mother failed another drug screen. The two remained together, and neither was able to maintain the progress they had made under the permanency plans.

The trial court found it troubling, and telling, as do we, that by the time of trial, Mother and Father showed that they were fully capable of completing many of the tasks assigned to them. Unfortunately, for years, they failed to do enough to reunite the family. By then, the three younger children were fully integrated into a foster home where they found the love, support and stability they needed. Foster mother testified that, when they first arrived, they all demonstrated hyperactivity, would not listen, and seemed unable to comprehend directions on how to do basic tasks. In the years since, their behavior improved and they understood there were consequences for their actions. All three were doing well in school, participated in sports, and had monthly therapy sessions. Although theirs was not a preadoptive home when the three siblings were taken in, the foster parents had since decided they wanted to provide them with a "forever home."

V.L.J., then fourteen, testified at trial. She was raised by her maternal grandmother until she was nine because Mother had a drug problem. She returned to Mother's custody for less than a year before her removal. In the ensuing years, V.L.J. was in and out of multiple foster homes with her stays often being short-lived because of her disruptive behavior. V.L.J. had made progress in her continued counseling and therapy. Despite the

difficulties she had experienced in foster care, V.L.J. was not interested in returning to Mother, whom she had not seen in the three months before trial. She testified to her desire to be adopted. V.L.J. reasoned that Mother and Father belonged together and "couldn't take care of each other without each other." V.L.J. said she loved Mother, but did not think it would be "the appropriate thing" for them to live together because they did not get along, and, as the child put it, Mother "can barely keep up with herself. . . ."

On our review, we conclude that the evidence preponderates strongly in favor of the trial court's best interest determination. There was clear and convincing evidence to show that, after four years in state custody, the Children's interest was best-served by severing Mother's and Father's ties to them, and freeing them to find permanent homes at an earlier opportunity. The trial court did not err in its determination of the best interest of the Children.

IX.

The judgment of the trial court terminating Mother's and Father's parental rights is affirmed. Costs on appeal are taxed to the appellants, D.G.B. and D.C.B. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE